**MORTON SALT COMPANY, a**
Corporation

v.

· ¯The **UNITED STATES.**

No. 142–58.

United States Court of Claims.

May 10, 1963.

Lloyd M. McBride, Chicago, Ill., for plaintiff. Robert B. Gerrie and McBride, Baker, Wienke & Schlosser, Chicago, Ill., were on the brief.

John F. Murray, Washington, D. C., with whom was Asst. Atty. Gen., Louis F. Oberdorfer, for defendant; Edward S. Smith and Charles Mehaffy, Washington, D. C., were on the brief.

Before JONES, Chief Judge, and WHITAKER, LARAMORE, DURFEE and DAVIS, Judges.

JONES, Chief Judge.

Plaintiff, an Illinois corporation having its principal place of business in Chicago, is engaged in the pursuit of extracting, processing, and selling salt in its various forms and grades. As a salt producer, plaintiff is entitled to deduct from its income and excess profits taxes amounts based upon an allowance for the depletion of its mineral resources. Plaintiff seeks a refund of its taxes for the years 1951, 1952, 1953, and 1954 on the ground that it was not permitted to base its computations for depletion allowance on its gross income derived from the sale of finished products in those years. Taxpayer's claim for the first three years in question is predicated upon the provisions of the Internal Revenue Code of 1939 while its 1954 claim is derived from similar provisions of the Internal Revenue Code of 1954.

Section 23(m) of the Internal Revenue Code of 1939 [1] provides for a reason-

---

1. Section 23(m) provides as follows:
"(m) Depletion.
"In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. * * *" 26 U.S.C. § 23(m) (1952).

able depletion allowance for the mineral mining industry according to regulations to be prescribed by the Commissioner of Internal Revenue. The basis for this depletion allowance is as set forth in section 114[2] of that Code, and establishes that sodium chloride (salt) is to be depleted at 5 per centum of the gross income from the property during the taxable year. Such "gross income," the Code explains, means "gross income from mining." Mining includes "not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by the mine owners or operators in order to obtain the commercially marketable mineral product or products." These same provisions are carried forward essentially unchanged into the Internal Revenue Code of 1954, except that the depletion rate for sodium chloride is increased to 10 percent.[3] For simplicity, then, we shall treat all plaintiff's claims as though they arose under the earlier statutory provisions.

The sole issue[4] presented for decision in this case arises from plaintiff's contention that all of its processes, including the packaging of its salt, are "normally applied" by miners in order to obtain a commercially marketable product within the meaning of the depletion statute and associated Treasury Regulations.[5]

Plaintiff produces salt by hydraulic mining (brine wells) and dry mining (rock salt mines). The salt so produced falls into three basic categories: evaporated granulated salt, evaporated flake or grainer salt, and rock salt. The rock

2. "§ 114. Basis for depreciation and depletion

\* \* \* \* \*

"(b) Basis for depletion

\* \* \* \* \*

"(4) Percentage depletion for coal and metal mines and for certain other mines and natural mineral deposits.

"(A) In general.

"The allowance for depletion under section 23(m) in the case of the following mines and other natural deposits shall be—

"(i) in the case of sand, gravel, slate, stone (including pumice and scoria), brick and tile clay, shale, oyster shell, clam shell, granite, marble, sodium chloride, and, if from brine wells, calcium chloride, magnesium chloride, and bromine, 5 per centum,

\* \* \* \* \*

of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance under section 23(m) be less than it would be if computed without reference to this paragraph.

"(B) Definition of gross income from property.

"As used in this paragraph the term 'gross income from the property' means the gross income from mining. The term 'mining' as used herein shall be considered to include not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products, \* \* \*."
26 U.S.C. § 114, (1952). For the definition of "ordinary treatment processes," see note 10, infra.

3. For the depletion provisions of the Internal Revenue Code of 1954, see 26 U.S. C. § 613 (1958).

4. Plaintiff's petition sounds in four counts. Count I sets out plaintiff's claim for refund of taxes based upon its depletion allowance computations for 1951, 1952, and 1953. Count III sets forth a similar claim for 1954. Counts II and IV relate to deficiencies assessed against taxpayer with respect to amounts received in excess of cost upon the sale of shares of treasury stock to its employees. As indicated in finding 55 of the trial commissioner's report, counts II and IV have been stipulated and are not in issue before the court.

5. For the tax regulations relating to the 1939 Code provisions, see Treasury Regulation 118, section 39.23(m)–1(e). In respect to the Internal Revenue Code of 1954, see § 1.6.3–3, Proposed Treasury Decision, published 11–3–56.

salt is produced by the dry mining method while both of the evaporated forms, basically, are produced by applying a heat evaporation process to the salt received in solution from the brine wells. These mining methods, with minor variations, are identical with those employed by other members of the salt industry. Since there are few secrets within the industry and since the systems are basically simple in principle, standardization is widespread. The process of dry mining, for example, has not been substantially changed in more than 50 years. As the parties have stipulated, and the trial commissioner has found, the treatment processes applied by plaintiff at its plants, with respect to the three basic types of salt, were as follows:

TABLE 1

| Evaporated granulated salt | | Evaporated flake or grainer salt | | Rock salt | |
|---|---|---|---|---|---|
| Stage | Process | Stage | Process | Stage | Process |
| 1 | Underground brining and pump lift at wells. | 1 | Underground brining and pump lift at wells. | 1 | Undercutting, drilling and blasting. |
| 2 | Treatment to remove brine impurities. | 2 | Treatment to remove brine impurities. | 2 | Underground conveying. |
| 3 | Vacuum pan evaporation. | 3 | Open pan and flash evaporation. | 3 | Through grizzly and primary crusher (underground). |
| 4 | De-watering. | 4 | De-watering. | 4 | Conveying and hoisting. |
| 5 | Kiln drying. | 5 | Kiln drying. | 5 | Scavenger screening. |
| 6 | Screening. | 6 | Screening. | 6 | Grinding. |
| 7 | Introduction of additives where required. | 7 | Introduction of additives where required. | 7 | Screening. |
| 8 | Bulk loading. | 8 | Bulk loading. | 8 | Kiln drying (fine grades per seasonal requirements). |
| 9 | Packaging and block presses. | 9 | Packaging. | 9 | Introduction of additives where required. |
| 10 | Package loading. | 10 | Package loading. | 10 | Bulk loading. |
| | | | | 11 | Packaging and block presses. |
| | | | | 12 | Package loading. |

Plaintiff takes the position that its production cycle is closed and continuous. As plaintiff's counsel expresses it, plaintiff

"\* \* \* starts out with sodium chloride underground, it moves its sodium chloride through a closed production circuit with gravity as the important propelling factor and at the end of that production circuit it loads its sodium chloride products on broad transportation units at its plants." [Brief for the petitioner, p. 46.]

This position is the fabric of petitioner's ultimate contention that it is entitled to a depletion allowance computed by taking the permitted percentage of its net sales of all its salt products, and that net sales equal gross income from those sales less returns, allowances, freight, warehousing, and salt purchased for resale. Defendant, on the other hand, maintains that plaintiff's crude extraction product is brine at the wellhead (in the case of brine wells), and rock salt from the muck pile (in the dry mining operation). If this contention were adopted with its full implications, plaintiff would be restricted to an allowance based upon only that percentage of gross income attributable to the mining of salt to these points and no further. Alternatively, the Government contends that all processes through drying and screening (step 6 for the evaporated salts and step 7 for rock salt, Table 1, supra) are allowable,[6] but that percentages of gross income attributable to the introduction of additives, compressing, and packaging are excluded. For reasons hereinafter set forth, we adopt the latter position.

Depletion at its inception in 1913,[7] was designed to make an allowance for the exhaustion of the mineral resources of a producer on the basis of the market value of the mineral at the mine. In 1918, the Congress authorized the introduction of the "discovery" concept of depletion.[8] In 1926, because the earlier methods created extreme administrative problems relating to the proper methods of determining "value," the system of percentage depletion was introduced into the computation of allowances with regard to the gas and oil industries.[9] At subsequent intervals other minerals and mining products were added to the approved list of depletable items, sodium chloride being included by section 319 of the Revenue Act of 1951, 65 Stat. 497.

■ Throughout the long history of depletion, it has been clear that the Congress intended to tax only the income from mining without touching the resources upon which the mine depended. The underlying depletion theory has always been to make an allowance from income for the exhaustion of the wasting assets. United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 81, 80 S.Ct. 1581, 4 L.Ed.2d 1581 (1960). For that reason it is important in this case to determine with accuracy the cut-off point between "mining" and "manufacturing" in the salt industry. The statute specifies that "mining" includes not just the process of extraction but also the processes normally applied by the miners to prepare their product or products for market. Section 114(b) (4) (B) defines "ordinary treatment processes" by means of inclusion.[10] Although sodium chlo-

6. As the trial commissioner reported in finding 51, this position is the one adopted by the Commissioner of Internal Revenue in passing upon plaintiff's claim.

7. The initial depletion allowance program was established by the *Income Tax Act* of 1913, 38 Stat. 167.

8. Revenue Act of 1918, 40 Stat. 1067.

9. Revenue Act of 1926, 44 Stat. 16. Section 204(c) (2) of that Act provided: "In the case of oil and gas wells the allowance for depletion shall be 27½ per

centum of the gross income from the property during the taxable year."

10. "The term 'ordinary treatment processes', as used herein, shall include the following:

\* \* \* \* \*

"(iii) in the case of iron ore, bauxite, ball and sagger clay, rock asphalt, and minerals which are customarily sold in the form of a crude mineral product— sorting, concentrating, and sintering to bring to shipping grade and form, and loading for shipment; and (iv) in the

ride is not included as such, we feel that these statutory delineations are helpful in that they indicate the type of processes intended by the Congress to be a part of mining. In each of the four statutory classifications, the allowable processes are directed at preparing crude ores or minerals for earliest sale prior to formal refining. This is emphasized by the express exclusion of thermal or electric smelting, refining, roasting, and other similar processes. Of course it would be arbitrary to insert salt into any one of these classifications at this point, and we do not attempt to do so.

In the application of the theory to the facts, we believe that the decision of the Supreme Court in the case of United States v. Cannelton Sewer Pipe Co., supra, is controlling. In that case the plaintiff mined raw fire clay and shale and manufactured it into a high-grade sewer pipe. The record showed that the Cannelton Company was unable to market raw clay profitably because the cost of transporting the clay to the nearest market alone exceeded the market price for that commodity. It was clear, however, that there did exist a substantial industry-wide market for raw clay. The Supreme Court, in reversing the Seventh Circuit,[11] held that "commercially marketable" did not mean marketable at a profit and that the plaintiff was its own economical market for its raw clay. The result of this was that the Cannelton Company was forced to compute its depletion allowance only on that portion of its gross income attributable to the constructive sale of raw clay to itself.

Defendant interprets this decision as requiring us to locate the cutoff point at the place where the *first* marketable product of the mine is produced, thus placing a gloss on the statutory language. In Cannelton, raw clay was the first product

to be removed from the ground. The Court said:

"Ever since the first percentage depletion statute, the cut-off point where 'gross income from mining' stopped has been the same, i. e., where the ordinary miner shipped the product of his mine. [United States v. Cannelton Sewer Pipe Co., supra, 364 U.S. at 87, 80 S.Ct. at 1587, 4 L.Ed.2d 1581.]

To determine the character of the ordinary product, it was essential to investigate the nature of the sales of the raw product on an industry-wide scale, and not restricted solely to the practices of the Cannelton Company. In this regard the Court said:

"The findings are that three-fifths of the fire clay produced in Indiana in 1951 was sold in its raw state. *This indicates a substantial market for the raw material.*

\* \* \* \* \* \*

"Proof of these sales is significant not because it reveals an ability to sell profitably—which the respondent could not do—but *because the substantial tonnage being sold in a raw state provides conclusive proof that, when extracted from the mine, the fire clay and shale are in such a state that they are ready for industrial use or consumption*—in short, they have passed the 'mining' state on which the depletion principle operates." [United States v. Cannelton Sewer Pipe Co., supra, 364 U.S. at 86, 80 S.Ct. at 1586–1587, 4 L.Ed. 2d 1581. (Emphasis added.)]

This language, taken in the context of that case, makes it clear that the salient feature was the substantial nature of the clay mined. This consideration has been borne out in a whole series of subsequent cases [12] and it controls the instant case.

case of lead, zinc, copper, gold, silver, or fluorspar ores, potash, and ores which are not customarily sold in the form of the crude mineral product—crushing, grinding, and beneficiation by concentration, \* \* \* cyanidation, leaching, crystallization, precipitation \* \* \*." 26 U.S. C. § 114(b) (4) (B) (1952).

11. Cannelton Sewer Pipe Co. v. United States, 268 F.2d 334 (7th Cir., 1959).

12. This principle was reaffirmed in Riddell v. Monolith Portland Cement Co., 371 U.S. 537, 83 S.Ct. 378, 9 L.Ed.2d 492. Reversed and remanded on the strength of Cannelton. In the lower courts, see,

We shall first consider the hydraulic mining aspect of plaintiff's operations. Because the Commissioner of Internal Revenue assessed the plaintiff on the assumption that step 6, Table 1, was the proper cutoff point in the computation of depletion allowance for the brine well production of salt, we are not in a position procedurally to consider whether the proper cutoff point should be placed prior to step 6. We need only decide whether, in the light of Cannelton, it should be located at some later point so as to include some or all of the additional steps.

■■ To take 1954 as a typical year of the period in question, some 12 million short tons of brine were sold or used in comparison with approximately 8½ million tons of salt in the dry form.[13] It is true that this large quantity of brine was used chiefly by chemical companies which produced brine for their own use, and not for sale to others. It is also true that in the years in question, plaintiff produced little or no brine for sale. But the Cannelton case teaches us that these considerations are immaterial. To borrow from the language of that case, modified to our own use, these sales are significant "because the substantial tonnage being sold in a raw state provides conclusive proof that, when extracted from the [ground], the [salt] is in such a state that [it] is ready for industrial use or consumption." Thus at stage 6, if not sooner, salt was produced in substantially marketable quantities within the meaning of the statute.

We now consider the dry mining portion of the case. An examination of the record shows that out of approximately 20 million tons of salt produced annually between 1951 and 1954, roughly 5 million tons were rock salt. While plaintiff produced a very low percentage (1.30 per cent average) of rock salt for sale prior to step 10, four other major producers [14] in those same years sold about half of their total production in bulk form at step 7 of the dry salt process. Since there is no showing of any appreciable sales in the industry prior to this step, we conclude that this is the proper cutoff point, as determined by the Commissioner of Internal Revenue, for sale produced by dry mining.

Plaintiff would have us distinguish the Cannelton decision on the ground that the producer in that case was integrated, while plaintiff herein is a nonintegrated producer. While it is true that plaintiff does not utilize its salt in the production of any other product that is chemically or physically different, there is some doubt as to the validity of that conclusion. Be that as it may, we believe the distinction to be without legal significance. It is apparent that the Supreme Court referred to the integrated nature of the producer in Cannelton only for the limited purpose of showing that the integrated producer was entitled to no benefits superior to its nonintegrated counterparts. United States v. Cannelton Sewer Pipe Co., supra, 364 U.S. at 86–87, 80 S.Ct. at 1586–1587, 4 L.Ed.2d 1581. There is no such distinction suggested by section 114 of the Code. In addition, we find the pre-Cannelton cases stressed by plaintiff to be unpersuasive in this case. As indicated by the Supreme Court, these cases for the most part go off on concessions not present in our case, or they are predicated upon the misconception cor-

e. g., Riddell v. Victorville Lime Rock Co., 292 F.2d 427 (9th Cir., 1961); Commissioner v. Halquist, 291 F.2d 49 (7th Cir.), cert. denied, 368 U.S. 930, 82 S.Ct. 367, 7 L.Ed.2d 193 (1961); Standard Realization Co. v. United States, 289 F.2d 247 (7th Cir., 1961); United States Pumice Supply Co. v. Commissioner, 36 T.C. 1160 (Sept. 29, 1961); Vulcan Materials Co. v. Sauber, 7 AFTR 2d 1130 (1961); Fannin Investment Co. v. Unit-

ed States, 197 F.Supp. 693 (N.D.Ga. 1961).

13. Bureau of Mines Minerals Yearbook, 1954, Vol. 1.

14. International Salt Co., Diamond Crystal Salt Co., Carey Salt Co., and Watkins Salt Co. We accept these as representative, since they appear in the record by stipulation of the parties.

rected in Cannelton that for a product to be commercially marketable, its sale must produce a profit to the plaintiff.[15] By comparison, the post-Cannelton decisions [16] are consistent in their nonsupport of plaintiff's contentions.

As we have previously stated, the procedural aspect of this case constrains us to agree with the Commissioner of Internal Revenue that all processes subsequent to screening and drying be disallowed; thus, plaintiff's petition as to Counts I and III must be dismissed. By a stipulation filed June 13, 1960, the parties agreed that (1) with respect to the allegations contained in Count II, plaintiff is entitled to recover the amount of the deficiencies paid, together with interest thereon as provided by law, and (2) with respect to the allegations contained in Count IV, plaintiff is entitled to recover an amount equal to 67½ percent of the amount of the deficiency set forth in that count, together with interest thereon as provided by law. For that reason plaintiff is entitled to recover on Counts II and IV of its petition and judgment will be entered to that effect.

The exact amount of recovery will be determined pursuant to Rule 38(c) of the Rules of this court.

15. See the Court's summation in note 10, United States v. Cannelton Sewer Pipe Co., 364 U.S. at 89, 80 S.Ct. at 1588, 4 L.Ed.2d 1581. The series of cases commencing with United States v. Cherokee Brick & Tile Co., 218 F.2d 424 (5th Cir., 1955) and culminating with United States v. Merry Bros. Brick & Tile Co., 242 F.2d 708 (5th Cir., 1957) were decided on the basis of concessions made by the Government. In Cherokee, for example, counsel for the Government admitted the crucial fact that only negligible quantities of raw clay were sold before being converted to brick. In Commissioner v. Iowa Limestone Co., 269 F.2d 398 (8th Cir., 1959), and like cases, the decision turned on the "profitability" test rejected in Cannelton.

16. See, e. g., the cases cited in n. 12, supra. In the Halquist case, plaintiff claimed that veneer stone was its marketable product but the court held that "in the light of Cannelton," processing rough uncut blocks of stone into veneer blocks could not be considered "mining." The court said that, lacking local information as to the marketability of rough stone, it must make recourse to the industry in general. In Standard Realization, where over 60 percent of plaintiff's product was shipped in the form of bulk silica sand without grinding or bagging, the court excluded these latter processes from the computation. The remainder of the cited cases follow in suit.