The **DOW CHEMICAL COMPANY**,
Petitioner-Appellee,

v.

**COMMISSIONER OF INTERNAL REVENUE**, Respondent-Appellant.

No. 20043.

United States Court of Appeals,
Sixth Circuit.

Oct. 12, 1970.

**284**

Bennet N. Hollander, Atty., Dept. of Justice, Washington, D. C., for respondent-appellant; Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson, Grant W. Wiprud, Attys., Dept. of Justice, Washington, D. C., on brief.

John F. Creed, New York City, for petitioner-appellee; Dennis I. Meyer, Washington, D. C., John P. Beukema, Chicago, Ill., on brief.

Before EDWARDS, CELEBREZZE and McCREE, Circuit Judges.

CELEBREZZE, Circuit Judge.

This is an appeal by the Commissioner of Internal Revenue (hereinafter, the "Commissioner") from a decision of the United States Tax Court determining the basis for the computation of the depletion allowance for income tax purposes of the Dow Chemical Company (hereinafter, the "Taxpayer"). The Taxpayer pumps natural brine from wells located at Midland and Ludington, Michigan, and extracts minerals from the brine through the application of various treatment processes. On appeal, the Commissioner contends that Taxpayer's "gross income from mining" (the statutory basis for depletion allowances) is the marketable value of the natural brine at the wellhead, rather than the gross sales value of the minerals Taxpayer extracts from the brine, as the Tax Court held.

The primary facts in this case are not generally contested and are recounted with some detail in the opinion of the Tax Court, 51 T.C. 669 (1969). The Taxpayer is an integrated miner-manufacturer of a diversified line of chemicals, metals and plastics. During the fiscal years of 1957 and 1958, it operated numerous wells which pumped natural brine from porous sandstone formations located several thousand feet below the earth. During each year, Taxpayer pumped in excess of 3,000,000 thousand gallons of natural brine from its sandstone deposits in Midland and Ludington, Michigan.

The brine, which emerges from the ground at about 95 degrees Fahrenheit, is a fully saturated solution containing approximately 70 per cent water and 30

per cent dissolved solids in the form of hydrated ions.[1] At both Midland and Ludington, the brine is processed for extraction of its bromine content (on the average less than .3 per cent of the total weight of the brine). Subsequently, at Midland, approximately 10 per cent of the brine solution is further processed to extract from the brine the minerals of sodium chloride or salt, potassium chloride or potash, calcium chloride and magnesium hydroxide. The remaining 90 per cent of the Midland brine is pumped back into the ground for repressurizing purposes. At Ludington, 30 to 50 per cent of the brine solution is further processed after the bromine is extracted and that solution yields magnesium chloride, magnesium hydroxide and calcium chloride. The remaining brine is pumped back into the ground for repressurizing purposes.

For purposes of determining "gross income from mining," Taxpayer reported the actual market price for the crude elements and compounds that it extracted from the natural brine. When minerals were sold in bulk and in varying degrees of subsequent refinement and packaging, the lower bulk price was used. The Taxpayer supported its computations before the Tax Court contending that it was a miner of bromine, magnesium hydroxide, magnesium chloride, calcium chloride, sodium chloride and potash, and not a miner of natural brines. Indeed, it asserted that the brine used was merely a low grade ore which when subjected to certain ordinary mining processes yields the aforementioned minerals. Further, Taxpayer affirmatively asserted that the brine used was not commer-

cially marketable as a crude mineral product nor was it an industrially usable product of Taxpayer's mining operations.

The Commissioner, however, contended (1) that the natural brine pumped by Taxpayer was the first commercially marketable product of its mining; (2) that the brine was not subject to ordinary mining processes, but to Taxpayer's integrated manufacturing and refining; and (3) that the applicable statute makes natural brine the depletable substance and not its extracted minerals. Hence, the Commissioner asserted that the depletion allowance which is to be based upon "gross income from mining" should not include any additions to the value of Taxpayer's brine after the mining process stops; that is, as the brine is pumped from the wellhead, ready for industrial or commercial use. In general, the Tax Court rejected the Commissioner's position and permitted the Taxpayer to use the gross bulk sales price for the crude minerals, with adjustments where a portion of the mineral was attributable to ingredients added during the mineral's extraction from the natural brine solution. The Commissioner is prosecuting this appeal contending that given the essentially undisputed facts the statutory and case law mandate a determination supporting his contentions. We do not agree.

The applicable statute, Section 613 of the Internal Revenue Code of 1954,[2] provides that miners of "property other than an oil or gas well" are entitled to percentage depletion based upon their "gross income from mining," 26 U.S.C. § 613(c) (1), although such depletion may

---

1. The dissolved solids are all in the brine in the form of hydrated ions.

A representative analysis of the composition of the brine by weight is as follows:

| Cations | Percentage by weight | |
| | Ludington | Midland |
| --- | --- | --- |
| Ca | 6.272 | 7.27 |
| Mg | 2.506 | 0.93 |
| Na | 1.141 | 2.19 |
| K | 0.488 | 0.87 |
| Sr | 0.177 | 0.29 |
| NH₄ | 0.0117 | 0.0443 |
| Fe | 0.0036 | 0.0030 |

| Anions | | |
| --- | --- | --- |
| Cl | 20.69 | 20.0 |
| Br | 0.2446 | 0.2864 |
| I | 0.0003 | 0.0040 |
| SO₄ | 0.0025 | 0.0048 |
| BO₃ | 0.028 | 0.16 |

The balance of weight is water.

2. See Appendix 5 for complete statute as then in effect.

not exceed 50 per cent of the Taxpayer's taxable income from the mining operations computed without a depletion deduction. 26 U.S.C. § 613(a). And "mining" is defined in the statute to include both "the extraction of the ores or minerals from the ground" and "the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products." 26 U.S.C. § 613 (c) (2). The statute, after defining "ordinary treatment processes" for certain specific minerals, further defines which of various processes are to be considered "ordinary treatment processes" by classifying the natural deposits mined into two groups: "minerals which are customarily sold in the form of a crude mineral product" and "ores which are not customarily sold in the form of the crude mineral product." 26 U.S.C. § 613(c) (4). In the former group of minerals, only a few processes [3] ordinarily taken by the miner to bring the minerals to shipping grade and form may be considered "mining" processes. In the latter group, numerous additional chemical and physical processes [4] taken by the miner to extract or separate crude minerals from the original ore are con-

sidered as "ordinary treatment processes" of mining operations.

The primary contention of the Commissioner on appeal is that natural brine is a raw mineral product, marketable in that form; and that under the rationale of United States v. Cannelton Sewer Pipe Co., 364 U.S. 76, 86–87, 80 S.Ct. 1581, 4 L.Ed.2d 1581 (1960) and 26 U.S. C. § 613(c) (4) (C), the Taxpayer's "gross income from mining" ceases at the brine wellhead and manufacturing begins at that point because Taxpayer's brine is a product "ready for industrial use or consumption." The Commissioner contends that the substantial quantities of natural brine transferred to the Taxpayer and to others is conclusive proof that natural brine is a "commercially marketable product;" and that further, the "industrial use" of natural brine as a source of its constituent minerals is a post-wellhead process which has "passed the 'mining' state on which the depletion principle operates." United States v. Cannelton Sewer Pipe, 364 U.S. at 86, 80 S.Ct. at 1587. The Commissioner would have us conceive of Taxpayer as an integrated miner-manufacturer which sells its natural brine to itself.[5] United States

---

3. 26 U.S.C. § 613(c) (4) (C) "in the case of iron ore, bauxite, ball and sagger clay, rock asphalt, and minerals which are customarily sold in the form of a crude mineral product—sorting, concentrating, and sintering to bring to shipping grade and form, and loading for shipment;" * * *.

4. 26 U.S.C. § 613(c) (4) (D)
   (D) in the case of lead, zinc, copper, gold, silver, or fluorspar ores, potash, and ores which are not customarily sold in the form of the crude mineral product—crushing, grinding, and beneficiation by concentration (gravity, flotation, amalgamation, electostatic, or magnetic), cyanidation, leaching, crystallization, precipitation (but not including as an ordinary treatment process electrolytic deposition, roasting, thermal or electric smelting, or refining), or by substantially equivalent processes or combination of processes used in the separation or extraction of the product or products from the ore, including the furnacing of quicksilver ores; and * * *.

5. In a number of cases subsequent to United States v. Cannelton Sewer Pipe, the Commissioner has been quite successful in maintaining that an integrated miner-manufacturer received an unfair advantage over non-integrated manufacturer competitors by basing his depletion allowance on a mined product which has been refined industrially beyond the "mining" state. Standard Realization Co. v. United States, 289 F.2d 247 (C.A.7th 1961) (quartz sand ground into flour); Commissioner of Internal Revenue v. Halquist, 291 F.2d 49 (C.A.7th, 1961), certiorari denied, 368 U.S. 930, 82 S.Ct. 367, 7 L.Ed.2d 193 (dolomite slabs processed into veneer building stone); Riddell v. Victorville Lime Rock Co., 292 F.2d 427, (C.A.9th, 1961) (limestone of chemical and metallurgical grade, ground to various sizes for various end uses); Virginia Greenstone Co. v. United States, 308 F.2d 669 (C.A.4th, 1962) (actionlite-chlorite schist sand-finished as ornamental or dimension stone); Morton Salt Co. v. United States, 316 F.2d 931, 161 Ct.Cl. 640 (1963), certiorari denied,

v. Cannelton Sewer Pipe, 364 U.S. at 87, 80 S.Ct. 1581.

We do not believe that the transfers of natural brine revealed in the record sustain the allegation that natural brine is a product which is "commercially marketable." First, the record reveals that several of the expert witnesses, including those of the Commissioner, indicated that there was no commercial market for natural brine and that if sales occurred they were highly unusual.[6] Second, it is conceded that Taxpayer never sold any of its natural brine; and that when Taxpayer received transfers of brine from others (oil producers to whom the brine was a waste product), Taxpayer received such brine for free and at most was required only to pay for its transportation from the oil fields to its facilities and to pay for its disposal after Taxpayer was finished extracting minerals from the brine. Third, apart from the aforementioned transfers the Commissioner cites evidence of only two other arrangements in which producers of brine from brine wells transferred or sold their brine. In both cases the operators of the brine wells transferred their brine to a concern which extracted bromine from the brine. In each case the operator of the wells yielding brine and the extractor of the bromine operated as if a "joint venture" for the mining of bromine in which two of the mining steps happened to be in separate hands. The financial arrangements of Murphy Oil Company[7] and the inability of Parnell, Incorporated[8] to market brine to anyone except its original venturer indicate that there was no "commercial market" for natural brine in its crude form and such brine could not be sold but only discarded as waste material and pumped back into the ground after some of its dissolved minerals had been extracted by certain treatment processes.

Further, we do not believe that the use of the transferred natural brine by Dow and other extractors of minerals from brine indicate that the natural brine was "ready for [manufacturing processes in] industrial use or consumption * * * [and hence] passed the 'mining' state on which the depletion principle operates" under the rationale of United States v. Cannelton Sewer Pipe Co., 364

375 U.S. 951, 84 S.Ct. 442, 11 L.Ed.2d 312 (brine and rock salt processed into marketable salt); United States v. Light Aggregates, Inc., 343 F.2d 429 (C.A.8th, 1965) (shale processed into lightweight aggregate); Iowa Limestone Co. v. United States, 365 F.2d 63 (C.A.8th 1966) (chemical and metallurgical grade limestone ground to various sizes for various end uses); Solite Corp. v. United States, 375 F.2d 684 (C.A.4th 1967), certiorari denied, 389 U.S. 841, 88 S.Ct. 70, 19 L.Ed. 2d 104 (weathered soft slate processed into light weight aggregate). None of these cases involve integrated miner-manufacturers which were involved in the reduction or extractive processes of minerals from ores, as opposed to addition reactions and refining processes. Further, only one of these cases involves the mining of a natural brine-like substance, Morton Salt Co. v. United States, 316 F.2d 931, 161 Ct.Cl. 640 (1963); and although in that case the Commissioner prevailed on appeal, he lost his "alternative" contention that natural brine as it came from the wellhead was a commercially marketable or depletable crude mineral. 316 F.2d at 934.

6. Ralph W. Parnell, President of Parnell, Incorporated. Dr. Kenneth K. Landes, Professor of Geology and Mineralogy at The University of Michigan.

7. In the Murphy Oil Company-Michigan Chemical Corporation arrangement the Murphy Oil Company which produced the natural brine was contractually obligated to pay half the costs of the extraction of the bromine from the brine. Hence, Murphy Oil was not selling brine to a commercial market, but rather transferring or selling it to a joint "mining" operation in which it was producer of the brine and partners to the subsequent extraction of bromine.

8. In the Parnell, Inc.-Arkansas Chemical Corporation arrangement, Parnell drilled its brine wells solely to sell the brine to Arkansas for extraction of its bromine. Parnell, Inc. sold the wells to Arkansas after brief operation because it believed that unless Arkansas purchased its brine from Parnell, Inc. that Parnell, Inc. would be "in a position of having brine wells and no one to sell the brine to." R–246 (Parnell's President).

U.S. at 86, 80 S.Ct. at 1587. The sole "industrial use" to which the natural brine was put before it was pumped back into the ground was to yield certain of its constituent minerals by application of Taxpayer's extractive processes, which were all ordinary treatment processes used by miners of such low tenor ores as natural brine.

■ While many industrial uses of minerals may fairly be characterized as "passed the 'mining' state," we believe that the extraction of crude minerals from a low tenor ore is one which Congress intended to be considered a part of the mining process, rather than the initiation of manufacturing or industrial processes. Section 613(c) (4) (D) of the Internal Revenue Code of 1954 explicitly permits depletion of certain minerals after a number of chemical and physical "processes or combination of process [have been] used in the separation or extraction of the [mineral] product or products from the ore." For example, solid ores containing gold or silver must be subjected to chemical processes in order to cause the respective minerals to first dissolve into a salt solution and secondly, precipitate out of that solution as crude elemental gold or silver. Such processes, clearly are "industrial use" of the gold and silver ore as brought up from the mine, but are considered "ordinary treatment processes of mining" because they serve to concentrate and extract from a low tenor ore (source of minerals in which the mineral sought is a small portion of the total crude mined deposit) a mineral which is commercially marketable. Thus, the Commissioner's position which would categorize as an "industrial use * * * passed the 'mining' state" any treatment process which extracted minerals by chemical means from an already mined source of minerals is inconsistent with the governing statutes which permit certain ores to be further mined for their constituent minerals so long as the treatment processes used are those ordinarily used by miners in the industry. 26 U.S.C. § 613(c) (4) (D).

■■ The natural brine pumped and processed by the Taxpayer is an ore which may be fairly categorized under Section 613(c) (4) (D),[9] rather than Section 613(c) (4) (C).[10] As legislative history of these provisions indicates, the amount of treatment processes which a miner was permitted to use on his mined ore and still be within the state of mining operation upon which the depletion principle operates depended upon the ratio of the ore to its marketable product. In a high tenor ore, in which the ore was largely marketable product, Section 613(c) (4) (C) sets out rather limited processes which may be performed upon the crude mineral product to ready it for shipping. In those instances, however, where the ore was of low tenor, the statute provides numerous chemical and physical extraction and concentration processes which may be used to get the relatively slim amount of marketable product from the ore. A review of the evidence presented on the tenor of the named ores in Section 613(c) (4) (C) and (D) and of the tenor of Taxpayer's natural brine convinces us that Taxpayer's natural brine is a low tenor ore.[11] Finding that natural brine is within the intendment of Section 613(c)(4) (D), we believe that Congress would permit the extraction of its constituent minerals to be considered a "mining process" rather than a manufacturing process of "industrial use * * * passed the 'mining' state."

■■ The next major point raised by the Commissioner on appeal is that the processes Taxpayer applies to the natural brine are not "ordinary treatment processes" allowable to a miner because they involve chemical and physical changes which create a new and more valuable end product. This contention falters, however, on the basis of the Commission-

9. See Footnote 4.

10. See Footnote 3.

11. See Appendix II.

er's own regulations which provided during the applicable tax years that certain designated chemical changes were permissible to extract a mineral from its ore, if that ore is not customarily marketable in its crude form. Treasury Regulations 118, § 39.23(m)–1(f) (1–3). We have already found that natural brine was not customarily marketable in its crude form. The Commissioner has not given us any reason to question the Tax Court's findings of fact that each of the Taxpayer's processes were analogous to or identical with the designated permissible processes in the Commissioner's own regulations and Section 613(c) (4) (D) of the Internal Revenue Code of 1954. We find, therefore, that the oxidation reduction reactions, vaporization, precipitation, crystallization, filtering and leaching processes used by Taxpayer are allowable as "ordinary treatment processes" under Section 613(c) (4) (D) in that they were used to extract "the product or products from the ore" as the statute requires. We also affirm the Tax Court in holding that to the extent that chemicals added to the brine in the extraction processes became part of the resultant crude minerals, the value of these added ingredients will not be included in the basis for the depletion allowance. Taxpayer is only entitled to deplete the "gross income from his 'mining'," which would not include the value of any chemicals added while extracting minerals from the brine.

Finally, the Commissioner contends that the statutory history of Section 613 of the Internal Revenue Code of 1954 suggests that the "natural deposit" of brine is a depletable substance and that the minerals extracted from the brine are manufactured by-products of the mining of "brine-from brine wells." 97 Cong.Rec. Part 9, p. 11597, 11603

(193). We have carefully reviewed the statutory history of the present Section 613 of the Internal Revenue Code of 1954 and it does not support the Commissioner's contention that "brine—from brine wells" is the depletable substance. Indeed, Section 613(b) (5) (B) in enumerating the percentage depletion rates for "mines, wells and other natural deposits" provides "if from brine wells— bromine, calcium chloride, and magnesium chloride." We believe that a fair reading of the statutory language in light of its history suggests that Congress meant to permit certain constituent minerals derived "from brine wells" to be depletable. Hearing on the Revenue Act of 1943 before the Senate Comm. on Finance 78th Cong., 1st Sess. 363, 369 (1943); Act of August 8, 1947, Ch. 515, § 515(b), 61 Stat. 917; Revenue Act of 1951, Ch. 521, 65 Stat. 452; S.Rep.No. 781, 82nd Cong., 1st Sess. 38 (1951).[12]

The judgment of the United States Tax Court is affirmed.

### APPENDIX I

Internal Revenue Code of 1954:

(Effective during the years in issue— June 1, 1956—May 31, 1958).

### SEC. 613. PERCENTAGE DEPLETION.

(a) *General Rule.*—In the case of the mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property

12. Further, in the Tax Reform Act of 1969, S.Rept. No. 91–552, p. 181 (1969) the Senate Finance Committee observed, "For purposes of determining the percentage depletion cutoff point in these cases, the extraction of the minerals from the brine [of saline perennial lakes] is to be considered an ordinary treatment proc-

ess." We believe that although this passage is concerned with the extraction of minerals from a saline perennial lake, rather than a brine well, it is an accurate reflection of Congressional intent as to whether the low tenor ore of brine or the specific minerals extracted from the brine are the depletable substance.

(computed without allowance for depletion). In no case shall the allowance for depletion under section 611 be less than it would be if computed without reference to this section.

(b) *Percentage Depletion Rates.*—The mines, wells, and other natural deposits, and the percentages, referred to in subsection (a) are as follows:

(1) 27½ percent—oil and gas wells.

(2) 23 percent—

(A) sulfur and uranium; and

(B) if from deposits in the United States—anorthosite (to the extent that alumina and aluminum compounds are extracted therefrom), asbestos, bauxite, beryl, celestite, chromite, corundum, fluorspar, graphite, ilmenite, kyanite, mica, olivine, quartz crystals (radio grade), rutile, block steatite talc, and zircon, and ores of the following metals: antimony, bismuth, cadmium, cobalt, columbium, lead, lithium, manganese, mercury, nickel, platinum and platinum group metals, tantalum, thorium, tin, titanium, tungsten, vanadium, and zinc.

(3) 15 percent—ball clay, bentonite, china clay, sagger clay, metal mines (if paragraph (2) (B) does not apply), rock asphalt, and vermiculite.

(4) 10 percent—asbestos (if paragraph (2) B) does not apply), brucite, coal lignite, perlite, sodium chloride, and wollastonite.

(5) 5 percent—

(A) brick and tile clay, gravel, mollusk shells (including clam shells and oyster shells), peat, pumice, and, scoria, shale, and stone, except stone described in paragraph (6); and

(B) if from brine wells—bromine, calcium chloride, and magnesium chloride.

(6) 15 percent—all other minerals (including, but not limited to, aplite, barite, borax, calcium carbonates, refractory and fire clay, diatomaceous earth, dolomite, feldspar fullers earth, garnet, gilsonite, granite, limestone, magnesite, magnesium carbonates, marble, phosphate rock, potash, quartzite, slate, soapstone, stone (used or sold for use by the mine owner or operator as dimension stone or ornamental stone), thenardite, tripoli, trona, and (if paragraph (2) (B) does not apply) bauxite, beryl, flake graphite, fluorspar, lepidolite, mica, spodumene, and talc, (including pyrophyllite), except that, unless sold on bid in direct competition with a bona fide bid to sell a mineral listed in paragraph (3), the percentage shall be 5 percent for any such other mineral when used, or sold for use, by the mine owner or operator as rip rap, ballast, road material, rubble, concrete aggregates, or for similar purposes. For purposes of this paragraph, the term "all other minerals" does not include—

(A) soil, sod, dirt, turf, water, or mosses; or

(B) minerals from sea water, the air, or similar inexhaustible sources.

(c) *Definition of Gross Income From Property.*—For purposes of this section—

(1) *Gross income from the property.*—The term "gross income from the property" means, in the case of a property other than an oil or gas well, the gross income from mining.

(2) *Mining.*—The term "mining" in includes not merely the extraction of the ores or minerals from the ground but also the ordinary treatment processes normally applied by mine owners or operators in order to obtain the commercially marketable mineral product or products, and so much of the transportation of ores or minerals (whether or not by common carrier) from the point of extraction from the ground to the plants or mills in which the ordinary treatment processes are applied thereto as is not in excess of 50 miles unless the Secretary or his delegate finds that the physical and other requirements are such that the ore or mineral must be transported a greater distance to such plants or mills.

(3) *Extraction of the ores or minerals from the ground.*—The term "ex-

traction of the ores or minerals from the ground" includes the extraction by mine owners or operators of ores or minerals from the waste or residue of prior mining. The preceding sentence shall not apply to any such extraction of the mineral or ore by a purchaser of such waste or residue or of the rights to extract ores or minerals therefrom.

(4) *Ordinary treatment processes.*—The term "ordinary treatment processes" include the following:

(A) In the case of coal-cleaning, breaking, sizing, dust allaying, treating to prevent freezing, and loading for shipment;

(B) in the case of sulfur recovered by the Frasch process-pumping to vats, cooling, breaking, and loading for shipment;

(C) in the case of iron ore, bauxite, ball and sagger clay, rock asphalt, and minerals which are customarily sold in the form of a crude mineral product—sorting, concentrating, and sintering to bring to shipping grade and form, and loading for shipment;

(D) in the case of lead, zinc, copper, gold, silver, or fluorspar ores, potash, and ores which are not customarily sold in the form of the crude mineral product—crushing, grinding, and beneficiation by concentration (gravity, flotation, amalgamation, electrostatic, or magnetic), cyanidation, leaching, crystallization, precipitation (but not including as an ordinary treatment process electrolytic deposition, roasting, thermal or electric smelting, or refining), or by substantially equivalent processes or combination of processes used in the separation or extraction of the product or products from the ore, including the furnacing of quicksilver ores; and

(E) the pulverization of talc, the burning of magnesite, and the sintering and nodulizing of phosphate rock.

(26 U.S.C. 1964 ed., Sec. 613.)

## APPENDIX II

### RATIOS BY WEIGHT OF ORES TO MARKETABLE PRODUCTS.

Commodities listed in subparagraph 613(c) (4) (C):

| Commodity | Ratio by weight of ore to marketable product |
|---|---|
| Iron ore [33] | 2.3 to 1 |
| Bauxite | 1.4 to 1 |
| Clays | 1.1 to 1 |

Commodities listed in subparagraph 613(c) (4) (D):

| Commodity | Ratio by weight of ore to marketable product |
|---|---|
| Lead | 30 to 1 |
| Zinc | 24 to 1 |
| Copper | 136 to 1 |
| Gold (lode) | 64,000 to 1 |
| Gold (placer) | 5,264,000 to 1 |
| Silver | 8,700 to 1 |
| Fluorspar | 2.8 to 1 |
| Potassium salts | 6.5 to 1 [34] |

Crude mineral extracted from Taxpayer's brines.

### MIDLAND

| Mineral | Percentage by weight in ore (brine) | Ratio by weight of ore to marketable product |
|---|---|---|
| Bromine | 0.287 | 349 to 1 |
| Magnesium hydroxide | 2.231 | 45 to 1 |
| Salt | 5.57 | 18 to 1 |
| Potash | 1.66 | 60 to 1 |
| Calcium chloride | 20.13 | 5 to 1 |

### LUDINGTON

| Mineral | Percentage by weight in ore (brine) | Ratio by weight of ore to marketable product |
|---|---|---|
| Bromine | 0.2446 | 409 to 1 |
| Magnesium hydroxide | 6.01 | 17 to 1 |
| Calcium chloride | 7.37 | 5.75 to 1 [36a] |