**MARTIN MARIETTA CORPORATION and Affiliated Corporations, American-Marietta Company as Succeeded in Interest by Martin Marietta Corporation, the Martin Company as Succeeded in Interest by Martin Marietta Corporation, Martin Marietta Corporation as Successor in Interest to American-Marietta Company, and Martin Marietta Corporation as Successor in Interest to the Martin Company, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 572–77.

United States Claims Court.

Sept. 23, 1983.

Dennis I. Meyer, Washington, D.C., for plaintiff. Robert A. Fesjian, Washington, D.C., and Baker & McKenzie, San Francisco, Cal., of counsel.

Robert S. Watkins, Washington, D.C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., Washington, D.C., for defendant. Theodore D. Peyser and Donald H. Olson, Washington, D.C., of counsel.

## OPINION

WIESE, Judge.

The question presently before the court in this multi-issue tax refund suit is whether plaintiffs, owners of a limestone bearing property, are entitled to a casualty loss deduction for the value of the mineral in place when exploratory drilling reveals groundwater of unanticipated volume that (i) floods a portion of the property and (ii) induces abandonment of mining operations on the remainder because of economic impracticality. We conclude that a casualty loss deduction is allowable only to the extent of the loss in market value attributable to the property actually flooded.

*Facts*

In 1965, plaintiffs purchased the fee interest in approximately 1,800 acres of agricultural land near Milan, Michigan. The total purchase price for this property (including closing and engineering costs) was $2,108,923. Plaintiffs anticipated using roughly 846 acres of the property to quarry shale and limestone for a cement manufacturing plant they intended to locate adjacent to the quarry site. To this end, both prior to and after their purchase of the Milan acreage, plaintiffs conducted numerous test borings to determine the existence of any geological restrictions that might impede use of the land for the intended mining-manufacturing operation. These borings revealed nothing unusual; therefore, plaintiffs authorized excavation of the quarry.

In 1965 and 1966, plaintiffs excavated a pit at the quarry site covering approximately 23 acres, including a ramp. On or about April 25, 1966, while drilling an exploratory hole in the bottom of this pit, the drill bit suddenly struck water which immediately began to gush out of the hole. The water spurted from a depth of approximately thirty-eight feet below the pit's floor and rose in geyser-like fashion to a height of about five feet above the ground. The water flowed from the hole at the rate of approximately 400 to 600 gallons per minute. In the course of this incursion, approximately nine acres of the pit became flooded with water.

Plaintiffs capped the initial flow but water continued to issue onto the quarry floor through fractures in the rock formation. Thereupon, plaintiffs hired American Dewatering Company, a firm of nationally known experts in the field of dewatering, to determine a method to stop the flow of water. The company conducted a pumping

test which disclosed a very high transmissibility of 200,000 gallons per day per foot. On the basis of this finding and further studies by Dr. D.T. Snow, a consulting groundwater hydrologist, it was estimated that, for the originally planned quarry length of 7,000 feet, the waterflow into the quarry pit could reasonably approach 2,000,000 gallons per minute.

Although seepage of water can be expected in connection with any mining activity and does occur from time to time in limestone mining, it is extremely unusual to encounter a 2,000,000 gallon per minute flow rate. Significantly, for a project of the sort plaintiffs had planned, it would normally not be economically feasible to attempt to arrest a waterflow in excess of 18,000 gallons per minute.

In addition to this highly unusual groundwater condition, a further complicating factor—and one equally unique as to frequency of occurrence—was a high concentration of hydrogen sulfide contained in the groundwater. Environmental laws of the State of Michigan forbade discharge of this groundwater into the surrounding surface waters—that is, until the discharge water had been sufficiently cleansed and treated. In short, this problem simply compounded an otherwise economically unattractive situation.

After the flooding occurred and on the basis of further tests thereafter conducted, the estimates as to the reserves of usable rock (meaning non-water bearing rock) were significantly reduced. In light of this fact, and the apparent certainty that water incursions would remain a problem, plaintiffs decided that continuance of their mining operation would not be economically feasible. Consequently, in years after 1966, plaintiffs sold portions of the Milan property and as late as 1979 were seeking to sell the remainder.

On December 20, 1971, plaintiffs filed a claim for refund of taxes for 1966 contend-

ing, among other things, that they were entitled to a casualty loss deduction in the amount of $1,559,000 with respect to their mineral properties at Milan, Michigan. The basis alleged for the deduction was that sudden and unexpected eruption of water had made mining operations impossible and had caused the mineral property to become worthless. The refund claim was disallowed by the Internal Revenue Service and the matter was then brought here for resolution.

### Discussion

Assessed in light of the parties' arguments, the issue that emerges in this case is not whether plaintiffs' property was affected by a casualty—this the Government is willing to concede—but, rather, whether the casualty loss extends to the entire mineral deposit. For purposes of its motion, the Government does not dispute that, as to the land actually flooded (the nine acres), the water incursion satisfies the criteria for which a casualty loss may be allowed [1]: an identifiable event, destructive or damaging to property, that was sudden, unexpected and unusual in nature. Rev.Rul. 592, 1972–2 C.B. 101.

Where the controversy begins then, is with the remainder of the property, that is, with that part of it which, though never actually flooded, was nevertheless deemed unsuitable for mining operations because of the verified likelihood of again encountering an unmanageable groundwater volume. As to this part of plaintiffs' mining property, the Government argues that no loss deduction is allowable. Specifically, the contention is that even if the later-discovered water condition did foreclose the possibility of a profitable mining operation, nevertheless, as the owners-in-fee, plaintiffs may recognize no deductible loss inasmuch as their property retained its usefulness for other purposes. This result is said to follow from the decision in *Henley v. United*

---

1. The Government's concession of a casualty loss on the flooded acreage is a concession made only for the purpose of facilitating disposition of the issue by motion rather than through trial. Accordingly, were trial ever to be necessary, plaintiffs would be obliged to prove all elements of a casualty loss.

*States,* 184 Ct.Cl. 315, 396 F.2d 956 (1968), where it was held that "[f]or the owner of the fee, the loss of a single land use during a particular tax year does not provide a 'closed and completed' transaction with respect to his entire estate in the land * * *." *Id.* at 330, 396 F.2d at 965.

Plaintiffs answer the argument by saying that the Government has missed a vital distinction. The *Henley* decision, they point out, did not involve a casualty loss but, rather, a loss of property value triggered by drilling results that had failed to confirm the existence of anticipated oil and gas reserves. The loss, in other words, was occasioned simply by a downward adjustment in property value based upon a changed assessment of the land's true worth. But that change, until verified by a closed and completed transaction—by disposition of the property through sale, for example—would remain a "paper" loss only. In other words, for tax purposes, the allowance of a loss requires its confirmation in the certainty of a fixed event.

From that distinction plaintiffs then go on to say that here there was such a fixed event—a flooding which the Government concedes was a casualty. And that concession, as plaintiffs see it, more or less ends the controversy. In their view, entitlement has been established; all that remains is the quantification of the loss (through facts to be determined upon a later hearing).

Though the point has not been squarely articulated by either side, the core of the dispute in this case is whether the plaintiffs may define the extent of their casualty loss by including therein the diminution in value of the unflooded acreage. The answer is that they may not.

In *Westvaco Corporation v. United States,* 225 Ct.Cl. 436, 639 F.2d 700 (1980), the question arose whether plaintiff, an integrated forest products manufacturer, was entitled to a casualty loss deduction on account of storm-caused impairment to the growth rate of standing timber. In answering this question in the taxpayer's favor, the court rejected the Government's contention that the damage was not deductible because the loss it entailed was only partial in character; deduction for a casualty loss, the court held, was not restricted only to instances involving total worthlessness of property. The court went on to say, however, that so far as the quantification of the loss was concerned, "plaintiff's calculation of the loss can only represent the change in fair market *value* attributable to the damage or destruction; it cannot deduct future profits, nor can it deduct paper losses." (Emphasis in original.) *Id.* at 445, 639 F.2d at 707.

This last is the point that is important here. The measurement of a loss occasioned by casualty is restricted to the value of the property actually lost or—as the court had stated it in *Westvaco*—to the change in fair market value "attributable to the damage or destruction". Excluded by definition are the indirect economic consequences of the casualty such as relinquished future profits or other predictable, though not yet experienced, "paper losses".

It is the application of this rule to the case at hand which dictates the conclusion first stated. Like the taxpayer in *Westvaco,* the present plaintiffs too have suffered casualty-caused damage to a part of their property; similarly, then, the calculation of the amount of their loss must focus upon the change in fair market value attributable to that damage. What it comes down to is that plaintiffs are entitled to deduct the decrease in value on the nine flooded acres, not the rest.

That is not to say of course, that the market value of the non-flooded acreage was unaffected by the events that occurred; indeed, we assume that there was a retrenchment in value. But that decrease was not the direct result of any casualty. Rather, as to the non-flooded acreage, the only immediate consequence was the undertaking of a more complete investigation of the subsurface conditions. This investigation revealed that the property was not as well suited to the conduct of a mining operation as had first been thought. And it was upon *that knowledge,* rather than upon the

existence of any physical injury to the property, that plaintiffs based their decision to abandon the mining operation.

There was, in fact, no damage or destruction on the unflooded acreage; that part of the Milan property remained precisely as it was when first acquired. All that changed was plaintiffs' knowledge of it—a circumstance, we should add, that might have been accomplished as readily before the flood as after it. Hence, as to those acres, there was no casualty—no closed or completed transaction upon which to base a claim for loss recognition.

The short of it is that plaintiffs find themselves in no different position than the taxpayer in *Henley, i.e.,* owners-in-fee of a resource property whose planned development was frustrated by later-discovered subsurface conditions different from those assumed at the start. Impaired usefulness of that sort, though economically damaging, occasions no tax consequences until the property is sold or otherwise disposed of. *Henley v. United States,* 184 Ct.Cl. 315, 330, 396 F.2d 956, 965 (1968); *Citizens Bank of Weston v. Commissioner,* 252 F.2d 425, 428 (4th Cir.1958).

### CONCLUSION

For the reasons given, plaintiffs are entitled to a casualty loss deduction to the extent of the loss attributable to the flooded acreage. As to the remainder of the Milan property, no casualty loss has been established. The Government's motion for partial summary judgment is therefore allowed; plaintiffs' cross-motion for partial summary judgment is denied (except to the extent of any loss that may be proven with respect to the flooded acreage). Judgment shall be entered following the parties' stipulation of amount.