**MARTIN MARIETTA CORPORATION and Affiliated Corporations, American-Marietta Company as Succeeded in Interest by Martin Marietta Corporation, the Martin Company as Succeeded in Interest by Martin Marietta Corporation, Martin Marietta Corporation as Successor in Interest to American-Marietta Company, and Martin Marietta Corporation as Successor in Interest to the Martin Company, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 572–77.

United States Claims Court.

Feb. 28, 1985.

Dennis I. Meyer, Washington, D.C., for plaintiff; John F. Creed, New York City, Robert A. Fesjian, Washington, D.C., Winston K. Zee, and Baker & McKenzie, New York City, of counsel.

Mary M. Abate, Washington, D.C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., Washington, D.C., for defendant; Theodore D. Peyser and Donald H. Olson, Washington, D.C., of counsel.

## OPINION

WIESE, Judge.

Plaintiffs, Martin Marietta Corporation and affiliated corporations, on their own behalf and as successors in interest to American-Marietta Company and to The Martin Company, claim entitlement to income tax refunds for their taxable years ended November 30, 1960 and September 30, 1961, the short taxable year October 1, 1961—December 31, 1961, and the taxable calendar years 1962–66 and 1969. In the present suit, which comprises part of what has been a multi-issue refund litigation,[1] the contention is that the Internal Revenue Service (IRS) erroneously disallowed certain mineral depletion deductions claimed for the years in question.

Plaintiffs are integrated miner-manufacturers of a variety of mineral and chemical products. One of their divisions, Standard Lime and Refractories Company (Standard Lime Division), operates a plant at Manistee, Michigan, where magnesium, in the form of magnesium hydroxide, is extracted from natural brine (a low tenor ore not marketable in its crude form) by means of a treatment process referred to as precipitation. The magnesium hydroxide is then further processed to obtain magnesium oxide—a product which, during the tax years in issue, was sold primarily to steel manufacturers as refractory raw material for use in lining steelmaking furnaces.

The "Manistee depletion claim", as this portion of the case involving the Standard Lime Division has come to be called, arises from percentage depletion deductions which plaintiffs claimed in respect of their production of magnesium hydroxide. Essentially, the controversy centers on three issues: the identity of the extraction product with respect to which plaintiffs may claim a depletion deduction, the identity of the processes that comprise plaintiffs' mining operations, and, finally, the amount of plaintiffs' gross income from mining—gross income being the basis upon which the allowance for depletion is initially calculated. These issues are examined in detail in the discussion portion of the opinion. In brief, the conclusion is that plaintiffs are entitled to a 5 percent depletion allowance for their extraction of magnesium (in the form of magnesium hydroxide) by a mining process whose cutoff point occurs prior to the kiln-heating that transforms the product to magnesium oxide.

## FACTS

During the years in issue, the Standard Lime Division produced magnesium oxide (MgO) from magnesium hydroxide ($Mg(OH)_2$), a product obtained by combining natural brine with a reagent, dolomitic lime or "dolime". The operation encompassed 17 to 23 brine wells in the Manistee, Michigan area. These wells pumped natural brine from porous Filer sandstone formations located approximately 2,200 to 2,800 feet below the earth's surface. Plaintiffs' wells produced, on average, 175,500 thousand gallons of natural brine per year during the relevant period.

The brine is a clear liquid solution of solids dissolved in water. The dissolved solids, which are present in the brine as hydrated ions, represent approximately 30

1. Of the several issues originally raised in the complaint, five were settled prior to trial of this case and one, the so-called "casualty loss" issue was the subject of an opinion issued by this court on September 23, 1983. *Martin Marietta Corp. v. United States,* 3 Cl.Ct. 453 (1983). Still to be decided is an issue growing out of plaintiffs' tax treatment of dolomite stone bearing property on which mining operations were voluntarily terminated in response to a proposed state condemnation action.

percent of the brine's content by weight.[2] The remaining 70 percent of the brine's weight is water.

The brine was pumped from the wellhead through a pipeline gathering network to plaintiffs' Manistee plant—a distance of no more than 10 miles. Prior to its arrival at plaintiffs' plant, the brine's bromine content was extracted, initially by Great Lakes Chemical Corporation and later by Michigan Chemical Corporation, pursuant to cost-sharing agreements between these companies and plaintiffs.[3] The brine emerged from debromination in a heated state which was more suited to the further processes applied at plaintiffs' plant.

At the Manistee plant, plaintiffs collected the brine in an outdoor storage tank. The precipitation process began when the brine was pumped to a smaller "head tank" inside the plant building. The brine flowed out of the head tank into a large vat, the "primary reactor", where it was mixed, by means of an agitator, with a reagent, dolomitic lime or dolime ($CaO–MgO$).

Plaintiffs obtained the dolime used as a reagent at the Manistee plant from another of their divisions, located at Woodville, Ohio. That division processed dolime by quarrying dolomite stone and calcining it—that is, heating it to a high temperature—which effected a chemical breakdown of the dolomite into dolime. The dolime was shipped by rail to plaintiffs' plant at Manistee.

In the chemical reaction that occurred when the brine and the dolime were combined, magnesium hydroxide ($Mg(OH)_2$) precipitated. The magnesium component of the magnesium hydroxide derived in part from the magnesium ions in the brine and in part from the magnesium oxide ($MgO$) in the dolime.[4]

The formation of magnesium hydroxide was completed in a secondary reactor. The product leaving the reactors was a slurry composed of solid magnesium hydroxide particles (approximately 9 percent by weight) and a liquor highly enriched in calcium chloride. The slurry was then pro-

2. A representative analysis of the ionic solids contained in the brine is as follows:

| Cations (positively charged ions) | % by Weight |
| --- | --- |
| Calcium ($Ca^{++}$) | 6.35 |
| Magnesium ($Mg^{++}$) | 2.40 |
| Sodium ($Na^+$) | 1.38 |
| Potassium ($K^+$) | 0.29 |
| Strontium ($Sr^{++}$) | 0.17 |
| Ammonia ($NH_4^+$) | 0.014 |

| Anions (negatively charged ions) | % by Weight |
| --- | --- |
| Chlorine ($Cl^-$) | 20.31 |
| Bromine ($Br^-$) | 0.23 |
| Sulfate ($SO_4^{--}$) | 0.003 |
| Boric Oxide ($BO_3^-$) | 0.027 |

3. Through the trial phase of this litigation, defendant had contended that the routing of the brine to other users constituted a sale and repurchase of the brine (by plaintiffs), thus triggering the disqualifying language of 26 U.S.C.

§ 613(c)(3) (1969), which denies depletion benefits to a "purchaser" of mining wastes or residues acquired for further extraction. Defendant's post-trial brief has abandoned this argument.

4. The chemical reaction which resulted in the precipitation of the magnesium from the brine involved several steps. In the first step, the calcium oxide ($CaO$) and magnesium oxide ($MgO$) components of the dolime combined with the brine water to form hydroxides of calcium and magnesium in a reaction called hydration, or slaking:

$$CaO \cdot MgO + 2H_2O \longrightarrow Ca(OH)_2 + Mg(OH)_2.$$

In the next step, some of the calcium hydroxide dissolved in the brine water, releasing hydroxyl ions:

$$Ca(OH)_2 \xrightarrow{\text{dissolves}} CA^{++} + 2OH^-.$$

The increased concentration of hydroxyl ions raised the pH of the reaction mixture.

The increase in pH caused the magnesium in the brine to precipitate as magnesium hydroxide:

$$Mg^{++} \text{ (from brine)} + 2OH^- \text{ (from dissolved Ca (OH)}_2\text{)} \longrightarrow Mg(OH)_2.$$

Additional calcium hydroxide dissolved as the magnesium hydroxide precipitated, which in turn permitted additional magnesium to precipi-

tate. This process would continue until all the magnesium in the brine was consumed.

cessed through three tanks of lake water, which diluted and washed away the chloride liquor while thickening the slurry. (The process is referred to as a countercurrent decantation system.) At this point, the slurry, now composed of approximately 30 percent magnesium hydroxide and 70 percent water, was pumped to a silo.

Next the slurry was dewatered. This was accomplished by pumping the material from the silo to a "ferris wheel feeder" which metered the volume of slurry being processed. The slurry was fed into a disc filter system which removed excess water using a filter cloth and vacuum. As it was removed from the disc filter, the slurry consisted of approximately 50 percent solids.

In the final step of the production process, the magnesium hydroxide was transported by a feed screw to a paddle mixer, which mixed the slurry with various chemical additives. Another feed screw then transported the mixture to rotary kilns. In the kilns, the magnesium hydroxide was calcined to drive off the remaining water. The product emerged from the kiln as magnesium oxide, which was then packaged for sale and shipment to plaintiffs' customers.

Prior to the taxable year 1965, plaintiffs had claimed no percentage depletion with respect to the brine processed at their Manistee plant. For their taxable years 1965 and 1966, however, plaintiffs did claim percentage depletion with respect to the brine itself. Then, in 1969, following the Tax Court's decision in *Dow Chemical Co. v. Commissioner*, 51 T.C. 669 (1969), *aff'd*, 433 F.2d 283 (6th Cir.1970), plaintiffs' tax return for that year claimed percentage depletion with respect to the magnesium hydroxide processed at Manistee. Also on the basis of that decision—which plaintiffs had read as authorizing the deduction claimed—plaintiffs filed claims for refund for the disputed years prior to 1969. The 1969 deduction, as well as the claims for

refunds, were disallowed by IRS. Plaintiffs then filed suit in this court.

## DISCUSSION

Section 611(a) of Title 26 (the Internal Revenue Code) allows as a deduction in computing taxable income a reasonable allowance for depletion of mines and other natural deposits.[5] Under § 613(a), one measure of this allowance for depletion is a specified percentage of the "gross income from the property". Section 613(a), reads, in pertinent part, as follows:

> In the case of the mines, wells, and other natural deposits listed in subsection (b), the allowance for depletion under section 611 shall be the percentage, specified in subsection (b), of the gross income from the property * * *. Such allowance shall not exceed 50 percent of the taxpayer's taxable income from the property (computed without allowance for depletion).

Section 613(c)(1) adds by way of explanation that:

> The term 'gross income from the property' means, in the case of a property other than an oil or gas well, the gross income from mining.

■ By the statutory formula then, determination of the depletion allowance involves a computation that requires the identification of several factors: the nature and extent of the mining process involved, the depletable end product derived through that process, and, the income that process yields—measured at both the gross income and taxable income levels. There is sharp disagreement between the parties on each of these points; it is to these conflicting views that we now turn.

### 1. *The Mining "Cutoff" Point*

Plaintiffs' position with respect to defining the scope of their mining operations is straightforward. They identify as "mining" the entirety of the extractive process from transportation of the brine from the

---

**5.** Unless otherwise noted, all references herein are to the Internal Revenue Code of 1954, as applicable for the calendar year 1969, the latest

year in issue in this case. Any relevant difference in an applicable statute from the statute as in effect for 1969 shall be noted.

wellhead through the washing and dewatering of the precipitate, the magnesium hydroxide slurry. Tested against the statutory scheme, there would seem to be little room to debate this position.

Mining as that term is defined by the applicable code section, includes not merely the extraction of the ores or minerals from the ground "but also the treatment processes considered as mining described in paragraph (4) (and the treatment processes necessary or incidental thereto), and so much of the transportation of ores or minerals * * * from the point of extraction from the ground to the plants or mills in which such treatment processes are applied * * *." 26 U.S.C. § 613(c)(2).

The referenced paragraph, paragraph (4) of § 613(c), lists the treatment processes that qualify as mining: "precipitation" is among the processes enumerated to the extent it is used in the separation or extraction of the product from "ores or minerals which are not customarily sold in the form of the crude mineral product * * *." 26 U.S.C. § 613(c)(4)(D).

Going by the letter of the law then, plaintiffs' position as to the extent of their operations that qualify as mining seems incontestable: they rely upon a listed treatment process—precipitation (and the processes incidental thereto)—to extract magnesium (in the form of magnesium hydroxide) from a low tenor ore not customarily sold in its crude form. Thus, for plaintiffs the mining cutoff point is to be found at the end of the dewatering process.

Despite the seeming correctness of plaintiffs' position, the Government urges a different view. Says the Government: precipitation within the intention of the statute contemplates a process that results in the extraction or separation of a depletable substance from the ore. Plaintiffs' process is said to be distinguishable because, in defendant's words, that "process was not used to separate or extract a depletable substance from the brine ore, but was used

to combine a depletable substance in the brine with a nondepletable additive (dolomite) and thereby to produce a wholly new chemical substance the magnesium content of which was made up of equal parts from the brine ore and from the additive." [6] Put another way—though again in defendant's words—"[t]hey [plaintiffs] elected to use the magnesium chloride, while still in the brine state, to manufacture magnesium hydroxide as an intermediate * * * step in the manufacture of magnesium oxide."

Thus, as the defendant views it, what is really going on here is production of a synthetic chemical, magnesium hydroxide, rather than the separation or extraction of a depletable constituent of the brine. By this view then, mining ceases at the head tank, prior to the addition of the reagent.

The court cannot accept the Government's position. To start with, the argument sounds much the same as the position that was presented and rejected in *Dow Chemical Co. v. Commissioner,* 51 T.C. 669 (1969), *aff'd,* 433 F.2d 283 (6th Cir. 1970). In that case, the Government had contended that the taxpayer's extraction process (involving the precipitation of magnesium hydroxide through the addition of slaked lime or calcium hydroxide to brine) did not qualify as mining because that process depended upon chemical change.

Neither the trial court nor the appellate court found this a persuasive argument. Pertinent are the words of the Tax Court:

[Section 613(b)(6)(C) ] must be read not only as an indication of the depletion percentage to be allowed with respect to the three minerals there enumerated [bromine, calcium chloride, and magnesium chloride] when obtained from brine wells, but it must also be read as a clearly implied intendment by Congress that even though the minerals as they exist in brine are chemically and physically different from the result of the use of permitted processes, they still retain their identity as mined products within

**6.** As was explained at note 4, *supra,* defendant is correct that roughly half of the magnesium hydroxide precipitate is attributable to magnesium from the dolime. However, plaintiffs do not claim depletion with respect to the magnesium derived from the reagent.

the meaning of section 613. [51 T.C. at 682.]

The Government seeks to sidestep the thrust of the Tax Court's words by claiming that they address a different argument from that raised here. The contention in *Dow*, defendant explains, was that the brine was the depletable substance and the subsequent extractive process, was, in reality, a chemical reformulation of the mined product, hence, not mining. Here, on the other hand, the Government sees the depletable substance to be the brine's magnesium chloride content and it views the extractive process as a reactive process through which magnesium hydroxide is manufactured, not mined.

■ Though the "catch-words" may be different, the two arguments are, beyond doubt, one and the same. Each is based on the notion that an extractive process that relies upon the chemical functions of a reagent is not precipitation within the meaning of the statute. Neither in *Dow* nor here has the Government offered any credible support for this proposition. Consequently, this court cannot presume, any more than could the Tax Court, that Congress would grant a statutory depletion allowance for, say, calcium chloride when drawn from brine wells, without correspondingly recognizing as a qualifying mining process the conventional industry means of accomplishing the permitted extraction. For us then, the answer to the Government's argument is the same as that given by the Tax Court.

■ Nor is a different answer called for because the magnesium hydroxide which plaintiffs obtain is not a naturally occurring constituent of the brine. Though the Government argues this point, *i.e.*, that magnesium hydroxide is not a mineral within the meaning of the statute because it is not present in the brine at the wellhead [7] and therefore its extraction does not qualify as mining, this, in the court's view, reflects far too narrow an understanding of the matter.

■ The depletion statute treats the extraction of valuable products from brine as mining since § 613(b)(6)(C) provides a specific depletion rate for bromine, calcium chloride, and magnesium chloride "if [recovered] from brine wells". However, these substances are present in brine only in an ionic state, that is, as positively and negatively charged particles—as bromine, calcium, chlorine, and magnesium ions—and thus are no more minerals by a geologist's definition [8] than is magnesium hydroxide. In reality then, defendant's notion of limiting application of the statute to the extraction of naturally occurring "minerals" is a position divorced from fact.

Given the truth of the matter—that brine is but a solution of solids in ionic form—the court can see no basis to distinguish between the recovery of magnesium ions from brine, when extracted in chemical combination with chlorine ions, and a magnesium recovery process in which the chlorine ions are left behind, *i.e.*, where the magnesium ions are extracted in the form of an hydroxide. Particularly does this seem a permissible position to adopt given that the statute does not restrict the depletion allowance only to the enumerated brine derivatives—it speaks as well of "all other minerals". 26 U.S.C. § 613(b)(7).

Nor do the regulations pose an obstacle to this view. Indeed, the definition of "minerals" provided in Treas.Reg. § 1.611–1(d)(5) (1960) is broad enough to encompass the magnesium content of the brine since it provides that the term "includes ores of the

---

7. Defendant's view that plaintiffs' precipitation of magnesium hydroxide does not extract a naturally occurring mineral and therefore must be denied treatment as a mining process is premised on the fact that the magnesium hydroxide $(Mg(OH)_2)$ derived from the magnesium ions in the brine contains one oxygen atom attributable to the hydration of the calcium oxide (CaO) component of the dolime $(CaO \cdot MgO)$.

8. The term "mineral" is defined as a naturally occurring homogeneous solid inorganically formed with a characteristic chemical composition and an ordered atomic arrangement. Ct. Ex. 1 ¶ 138.

metals, coal, oil, gas, and *all other natural metallic and nonmetallic deposits*". (Emphasis added.) It cannot be doubted that magnesium is a natural, nonmetallic deposit of the brine.

For the reasons given, the court finds little reason to favor the Government's argument that a naturally occurring substance in the brine—the magnesium ion—does not qualify for a depletion allowance because, in the form in which extracted here, it exists in chemical union as magnesium hydroxide. Accordingly, the court concludes that plaintiffs' precipitation process, through which the magnesium content of the brine is recovered in the form of magnesium hydroxide, is precipitation within the purview of "treatment processes considered as mining" under § 613(c)(4)(D). It follows, therefore, that the mining cutoff point in plaintiffs' process occurs after the magnesium hydroxide has been dewatered to a 50 percent solids content by processing through the hydrate disc filters.

### 2. The Identity of the Depletable Substance and Ascertainment of the Appropriate Depletion Rate

■ In light of the preceding discussion, the identity of the depletion product is no longer an issue open to debate: the court agrees with plaintiffs that they are engaged in the mining of magnesium from brine. But that determination only answers part of the problem here; what remains to be decided is the depletion rate plaintiffs may claim with respect to the magnesium.

■ Percentage depletion rates for mines, wells and other natural deposits are cataloged in § 613(b). This section provides for a depletion rate of 5 percent in the case of "bromine, calcium chloride, and magnesium chloride" extracted from brine wells; 26 U.S.C. § 613(b)(6)(C); in the case of "all other minerals" (subject to exceptions not pertinent here), the assigned depletion rate is 15 percent. 26 U.S.C. § 613(b)(7).

Plaintiffs contend that, since neither magnesium nor magnesium hydroxide is identified by name in the course of

§ 613(b), they are therefore entitled to the 15 percent depletion rate applicable to "all other minerals".

The court cannot accept this argument. The same reasoning which persuades us that the depletion statute encompasses the extraction of magnesium from brine also convinces us that the magnesium which plaintiffs extract in the form of magnesium hydroxide cannot be distinguished from the magnesium to which the statute assigns a depletion rate of 5 percent when extracted in the form of magnesium chloride.

To further explain: as was stated in the preceding analysis of the mining cutoff point, the magnesium chloride to which § 613(b)(6)(C) refers is present in brine only in an ionic state—that is, in the form of separate magnesium and chlorine ions. While a miner of magnesium chloride would extract both the magnesium and the chlorine ions from the brine, plaintiffs extract only the magnesium ions. The court can see no reason to allow plaintiffs a larger depletion allowance—15 percent—in respect of their exhaustion of only one component of the valuable product to which Congress has assigned a rate of 5 percent.

Mineral depletion for tax purposes, as the Supreme Court explained in *United States v. Cannelton Sewer Pipe Co.*, 364 U.S. 76, 80 S.Ct. 1581, 4 L.Ed.2d 1581 (1960), "is an allowance from income for the exhaustion of capital assets." *Id.* at 81, 80 S.Ct. at 1584. Bearing in mind this purpose, one cannot conclude that Congress intended to grant a greater allowance than that specified for magnesium chloride for the exhaustion of a smaller asset—the reserve of magnesium ions alone.

For these reasons the court finds that plaintiffs are entitled to a depletion rate of 5 percent, pursuant to § 613(b)(6)(C), in respect of their mining of magnesium in the form of magnesium hydroxide.

### 3. Gross Income From Mining

#### A.

"Gross income from mining" refers to that amount of income which is attributa-

ble to the extraction of the ores or minerals from the ground and the application of mining processes, including, mining transportation. Treas.Reg. § 1.613–4(a) (1973).[9] Under the statutory scheme, the determination of "gross income from mining" is an essential step in fixing the maximum allowable percentage depletion deduction since it is the base against which the specified depletion rate is applied.

In the case (not presented here) of a mining operation that sells its ore or mineral immediately after the application of mining processes, the calculation is a simple one: gross income from mining equals total sales revenue. By contrast, in the case of an integrated mining-manufacturing operation, where the mined ore or mineral is subjected to additional nonmining processes before being sold, ascertainment of the gross income from mining requires apportionment of the total sales dollar between the mining and nonmining constituents. For example, in this case, where plaintiffs mined magnesium (extracted in the form of magnesium hydroxide) and sold magnesium oxide, the gross income from mining is that portion of sales revenue allocable to the processes up to the mining cutoff point, i.e., through the reactor stages and the subsequent processes of washing and dewatering; excludable as a source of mining income is the final step in the process—the calcining operation which converted the magnesium hydroxide slurry to magnesium oxide.

The regulations specify several methods by which an integrated miner-manufacturer may determine its gross income from mining. The preferred method, the so-called "representative market or field price" method, computes gross income by reference to the competitive sales price "of an ore or mineral of like kind and grade as the taxpayer's ore or mineral after the application of the mining processes actually applied * * *." Treas.Reg. § 1.613–4(c)(1). The aim here, as the regulation goes on to explain, is to draw from the competitive marketplace "the dollar figure or amount which most nearly represents the approximate price at which the taxpayer * * * could have sold his ores or minerals if, prior to the application of nonmining processes, the taxpayer had sold the quantities and types of ores and minerals to which he applied nonmining processes." Id. In other words, the representative market or field price method of computing gross income from mining utilizes market criteria to "construct" a mining revenue figure for the integrated miner-manufacturer.

In situations where a representative market or field price cannot be determined, the regulations prescribe the use of the so-called proportionate profits method to compute gross income from mining. This method utilizes a cost-based approach to determine mining income. Specifically, what is involved is "multiplying the taxpayer's gross sales (actual or constructive) of his first marketable product * * * by a fraction whose numerator is the sum of all the costs allocable to those mining processes which are applied to produce, sell, and transport the first marketable product * * * and whose denominator is the total of all the mining and nonmining costs paid or incurred to produce, sell, and transport the first marketable product * * *." Treas.Reg. § 1.613–4(d)(4)(ii). In equation form, the proportionate profits method is expressed as follows:

$$\frac{\text{Mining Costs}}{\text{Total Costs}} \times \text{Gross Income} = \text{Gross Income From Mining}$$

## B.

As between the two methods described, plaintiffs urge our use of the representative market or field price claiming, as the appropriate comparative for this purpose,

9. Treasury Regulation § 1.613–4 (1973), is the principal regulation explaining the concept of "gross income from mining" in the case of minerals other than oil and gas. This regulation was promulgated by Treasury Decision 7170, 1972–1 C.B. 178, which provides that Treas.Reg. § 1.613–4, except as otherwise provided therein, is applicable to taxable years beginning after December 31, 1953 and to taxable years ending after August 16, 1954.

the price of magnesium hydroxide as produced and sold by Dow Chemical Company.

This position cannot be endorsed. In order to compute gross income from mining through use of a representative market or field price, the reference must be to "an ore or mineral of like kind and grade as the taxpayer's ore or mineral", Treas.Reg. § 1.613–4(c)(1), (2), the sales of which "are the result of competitive transactions." Treas.Reg. § 1.613–4(c)(3). Neither of these twin requirements is fully satisfied here.

■ Concerning the first requirement, this observation is in order. To serve as a valid basis upon which to construct gross income from mining, the representative market or field price must be drawn from a product which corresponds to the depletable ore or mineral in question—in this instance, magnesium. Here, however, plaintiffs seek to rely upon the market price of magnesium hydroxide—a compound which includes, but which obviously is not limited to, magnesium. On the very face of it, therefore, plaintiffs claim reliance upon the price of an ore or mineral that is not of like kind and grade as the magnesium in regard to which their claim for depletion allowance is based. Putting it in basic economic terms, the objection is that one cannot say, as plaintiffs would have the court do, that the market value of the depletable magnesium, were it to be sold alone, would be the same as the market value of magnesium hydroxide.

The court recognizes that the issue is perhaps not as simple or straightforward as it has been made to appear since magnesium hydroxide is, as a matter of fact, the form in which the extracted magnesium ion appears as the result of the application of plaintiffs' mining processes. In other words, the argument in defense of plaintiffs' reliance upon the price of magnesium

hydroxide is that magnesium, while a depletable constituent of the brine in its own right, is nevertheless not extractable except in compound form.

■ Accepting this point for discussion's sake, plaintiffs then face the further difficulty that the magnesium hydroxide price they seek to build upon is not a price that has been competitively established. Indeed, it appears that, for the period in question here, there was but one principal source of supply for magnesium hydroxide, that being the Dow Chemical Company. Consequently, plaintiffs run afoul of that part of the regulation which instructs that "[s]ales or purchases * * * of ores or minerals of like kind and grade as the taxpayer's, will be taken into consideration in determining the representative market or field price for the taxpayer's ore or mineral only if those sales or purchases are the result of competitive transactions." Treas. Reg. § 1.613–4(c)(3). For lack of any other competing sources of supply,[10] the price of magnesium hydroxide sold by Dow Chemical Company cannot be considered a representative market or field price.

## C.

It follows from the foregoing discussion that, in this case, the determination of plaintiffs' gross income from mining must proceed by use of the proportionate profits method. Within the framework of that formula there are three matters that require attention here.

First, there is disagreement between the parties regarding the treatment to be given to the dolime costs, that is, whether or not these costs are to be counted as part of the mining costs. The dispute on this point stems chiefly from the opposing positions which the parties draw from an analogous issue considered in *Standard Lime and Cement Co. v. United States*, 165 Ct.Cl. 180, 329 F.2d 939 (1964).

**10.** The record includes a stipulation that names a Michigan Chemical Company of St. Louis, Michigan, as the only other source of magnesium hydroxide during the period in question.

However, no information is given respecting either the price of the company's product or the market in which the product was sold.

The *Standard Lime* case was concerned in the overall with the application of the proportionate profits method in the determination of gross income from mining for an integrated limestone mining-cement manufacturing operation. Among the questions in the case was whether certain purchased additives—shale, sand, and minute quantities of iron ore—though essential only to the cement manufacturing phase of the business were, nevertheless, to be included among and therefore charged as mining costs because the additives had physically been introduced into the overall operation prior to the statutory mining cutoff point.

In considering the issue, the court decided, first of all, that because the additives had been introduced in conjunction with a mining process their costs could not be assigned to the category of nonmining expenditures. At the same time, however, the court did not view use of the additives in conjunction with a mining process as compelling inclusion of their costs as part of mining costs. Said the court: "Admittedly these costs are incurred prior to the cutoff point; however, we are here concerned with taxpayer's gross income from *mining* of limestone and shale in order to compute its proper depletion allowance, thus it should not be entitled to an allowance with respect to minerals which it does not mine [*i.e.*, the purchased additives]." *Id.* at 197, 329 F.2d at 949.

Accordingly, as the court saw it, the only solution to this impasse was to completely exclude the additive costs from the proportionate profits computation. Only by a total exclusion of these extraneous costs could the court avoid improperly enhancing the depletion allowance for limestone and shale by an amount attributable to mineral additives which had themselves been the subject of depletion allowances claimed by the same taxpayer.

It is in conformance with this reasoning that the court is urged to strike the dolime costs from the proportionate profits equation. The reason for doing so, we are told, is that plaintiffs obtained the benefit of a depletion allowance on the dolime at the time they initially extracted it; thus they should not be permitted to claim that benefit a second time around—this time in the guise of a mining cost incurred in the extraction of magnesium from brine.

There is some merit to this argument; however, its application here requires much refinement. To start with, this point is to be noted: the exclusion of the purchased additives from the catalog of mining costs in the *Standard Lime* case rests fundamentally on the fact that those additives, though introduced during a mining process, were nevertheless not integral to that process. That is to say, the additives did not contribute to the actual extraction of limestone or shale; thus their costs could not be viewed as "mining costs" in the intended sense of the term. In other words, while the additives were introduced "upstream", that is, prior to the statutory mining cutoff point, their function was crucial only in the "downstream" process of cement manufacture. Given that critical fact, inclusion of the additive costs as mining costs in the proportionate profits equation was analytically unacceptable; not to have stricken them would have created an artificial enhancement of mining costs and thus of the depletion allowance.

The same is not true with respect to the dolime—at least not entirely. As explained earlier in this opinion, *see* note 4, the addition of the dolime in plaintiffs' process accomplishes a double function: the calcium oxide (CaO) component of the dolime serves as the reagent which precipitates the magnesium from the brine, while the magnesium oxide component of the dolime (MgO) hydrates to form additional magnesium hydroxide, augmenting that extracted from the brine. Thus the dolime is, in part, vital to the process that accomplishes the extraction of the magnesium from the brine (there could be no precipitation absent the reagent) and, in part, it is simply an additional constituent of the reaction mixture that is itself processed for its magnesium content.

■ Consequently, to the extent the dolime functions as a reagent, it is essential to the process that accomplishes the extraction of the magnesium from the brine. Hence, in that capacity, it must be regarded as a mining cost. However, to the extent the dolime serves simply as a source of additional magnesium, it remains a nondepletable ore, the costs and processing of which cannot qualify as mining costs. *See* Treas.Reg. § 1.613–4(d)(3)(ii) (1973).[11]

With respect to apportioning the costs of the dolime (including related transportation expenses) the record offers no specific data. What we do have is a breakdown, by weight, of the chemical constitutents of the dolime. This shows that, on a lot-by-lot basis, calcium oxide ranged from 57.5 to 58 percent of the total weight of the dolime and the magnesium oxide ranged from 40.5 to 41 percent by weight. (The remaining constituents, comprising on average approximately 1 percent, were oxides of various metals—silicon, iron, aluminum and carbon.) For want of anything better to go on, the court must use these numbers as a basis for determining mining and nonmining costs. Thus, 58 percent of the costs of the dolime, including a like percentage of transportation charges, shall be taken as mining costs.

■ Even as the costs of the dolime require apportionment between mining and nonmining expenses, so also must the costs of the treatment processes incidental to the precipitation process—the washing and dewatering of the magnesium hydroxide slurry—be similarly divided.[12] The division of these functions into mining and nonmining operations follows, of necessity, from the fact that they are processes which are being applied to a product, the magnesium hydroxide slurry, that derives only in part from a depletable ore. As explained, part of the magnesium comes from the dolime, meaning, in this case, from a nondepletable source; and to that extent then, the related processing costs are nonmining costs.

Based on computations which have been left to a footnote,[13] the court has determined that, for each ton of magnesium hydroxide slurry produced by plaintiffs' Manistee operation, slightly more than one-half (.504) of the washing and dewatering expenses qualify as mining costs; the remainder, of course, are nonmining costs.

The final matter that requires attention is the fact that the parties propose to measure gross income (for purposes of the proportionate profits method of computation) by reference to magnesium hydroxide, *i.e.,* developing a gross income figure by plaintiffs' constructive sale of magnesium hydroxide measured at the market price. This approach is not correct.

■ Gross income, for purposes of the proportionate profits equation, refers to a taxpayer's gross sales, actual or construc-

11. The cited regulation, Treas.Reg. § 1.613–4(d)(3)(ii) (1973), provides, in relevant part, as follows: "In determining gross income from mining by use of methods based on the taxpayer's costs, a process shall not be considered as a mining process to the extent it is applied to ores, minerals, or other materials with respect to which the taxpayer is not entitled to a deduction for depletion under section 611. The costs of such nondepletable ores, minerals, or materials; the costs of the processes (including blending, size reduction, etc.) applied thereto; and the transportation costs thereof, if any, shall be considered as nominating [sic] [should read nonmining] costs in determining gross income from mining."

12. Defendant does not question the qualification of the washing and dewatering of the magnesium hydroxide slurry as treatment processes considered as mining. Such processes, where necessary or incidental to a statutorily-recognized treatment process, qualify as mining processes under Treas.Reg. § 1.613–4(f)(5)(iii) and (iv).

13. Determination of the value of .504 as the percentage of the washing and dewatering costs assignable as mining costs is based on the following: the briefs explain that each ton of dolime, when reacted with brine, yields 1.197 tons of magnesium hydroxide slurry. Of that amount, 0.603 tons derives from the reaction of the magnesium in the brine and 0.594 tons trace to the hydration of the magnesium oxide component of the dolime. Therefore, on a proportionate basis, each ton of magnesium hydroxide would represent .504 tons derived from the brine. The proportion is determined by the equation: $1.197 : .603 = 1 : X$.

tive, of the "first marketable product"—a term which the applicable regulation defines as "the product * * * produced by the taxpayer as a result of the application of nonmining processes, in the form or condition in which such product * * * [is] first marketed in significant quantities by the taxpayer or by others in the taxpayer's marketing area." Treas.Reg. § 1.613–4(d)(4)(iv).

Under the standard contemplated by the regulation, gross income must be measured here by the taxpayer's actual sales of magnesium oxide and not by constructive sales of magnesium hydroxide. This follows from the fact that it is the former, and that only, which meets the requirement of the first marketable product resulting from the application of *nonmining* processes. To put it into specifics, the first nonmining process in plaintiffs' operations is the heat process (the calcining operation) which converts the magnesium hydroxide slurry into magnesium oxide; hence, the first marketable product within the meaning of the regulation is magnesium oxide.

### D.

With these points decided, what the matter comes down to is the following. First, under the heading of mining costs, there shall be included: 100 percent of the costs of extracting and transporting the brine from the wellhead to the reactor stage, 58 percent of the costs of acquiring, transporting and processing the dolime, and .504 percent of the cost of the post-precipitation processes—the washing [14] and dewatering of the magnesium hydroxide slurry. Second, under the heading of total costs, there is to be added to the foregoing mining costs, the remaining 42 percent of the dolime costs, the remaining .496 percent of the cost of post-precipitation processes and 100 percent of the costs incurred after the introduction of the magnesium hydroxide slurry into the kilns including the selling expenses associated with the marketing of the magnesium oxide products.

The values thus determined for mining costs and total costs function, respectively, as numerator and denominator of the proportionate profits fraction while gross sales, as determined from plaintiffs' actual sales of magnesium oxide, becomes the base to which the fraction is applied. The resulting value represents the taxpayers' gross income from mining.

### 4. *Taxable Income From Mining*

The final figure of importance here is the taxpayers' taxable income from mining (computed without allowance for depletion), for by the statutory formula the deduction for depletion may not exceed 50 percent of that figure. The calculation of this ceiling on depletion presents no special problems here; in this case taxable income from mining is simply the difference between gross income from mining and mining costs. Treas.Reg. § 1.613–5(a) (1973).

Accordingly, the taxpayers are entitled to a percentage depletion deduction of 5 percent measured against gross income from mining but not to exceed 50 percent of their taxable income from mining—each income figure to be ascertained in accordance with the cost outlines specified in this opinion.

### CONCLUSION

For the reasons given, plaintiffs are entitled to recover. Judgment is to be for plaintiffs with the amount to be determined by the parties within 60 days of the date of this opinion.

---

14. The court includes effluent disposal as part of the washing process.