MARTIN MARIETTA CORPORATION and Affiliated Corporations, American-Marietta Company as Succeeded in Interest by Martin Marietta Corporation, the Martin Company as Succeeded in Interest by Martin Marietta Corporation, Martin Marietta Corporation as Successor in Interest to American-Marietta Company, and Martin Marietta Corporation as Successor in Interest to the Martin Company, Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 572–77.

United States Claims Court.

March 22, 1985.

Dennis I. Meyer, Washington, D.C., for plaintiffs. John F. Creed, Robert A. Fesjian, Winston K. Zee, and Baker & McKenzie, Washington, D.C., of counsel.

Mary M. Abate, Washington, D.C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., for defendant. Theodore D. Peyser and Donald H. Olson, Washington, D.C., of counsel.

OPINION

WIESE, Judge.

In 1965, plaintiffs, the owners of a dolomite stone quarry, received notice from local government officials that a portion of their mining property might be condemned to permit the relocation of a bordering highway. The condemnation was not carried out until 1970. In the intervening years, however, plaintiffs calculated their statutory allowance for cost depletion [1] on

1. The dolomite stone deposit on plaintiffs' quarry property is a natural mineral deposit in respect to which the Internal Revenue Code and the Treasury Regulations provide for a deduction from income of a reasonable allowance for depletion. 26 U.S.C. § 611(a) (1982); Treas.

the basis of an estimate of recoverable reserves that anticipated the reduction in minable stone expected from the proposed taking. This had the effect of increasing their per-ton depletion rate—a result with which the Internal Revenue Service (IRS) disagreed. After taking into account other tax adjustments not relevant here, the IRS disallowed $65,481 in claimed depletion allowance. In this refund suit, plaintiffs seek the restoration of this deduction and a refund of the taxes paid in consequence of its disallowance.

## FACTS

In April of 1963, plaintiffs, through their Appalachian Stone Division, purchased in fee simple a 95-acre tract of land, including a quarry and processing plant, from the Valley Forge Stone Company. The total purchase price was $1,442,492. Of that amount, $746,492 was allocable and was allocated to the recoverable mineral reserves at the quarry, primarily Lower Cambrian Ledger Dolomite, estimated at 10,-050,000 tons.

The property was located at the northwest corner of the intersection of Swedesford Road and Morehall Road in East Whiteland Township, Chester County, Pennsylvania. A 1961 resolution of the East Whiteland Township Board of Supervisors restricted the quarrying operations on the property to the eastern 32.2 acres of the tract subject to additional limitations which prohibited quarrying within 100 feet of Morehall Road and within 150 feet of "the ultimate right of way of Swedesford Road."

In 1963 and 1964, plaintiffs mined and sold a total of 824,286 tons of stone from the quarry. Cost depletion at the rate of $.07428 per ton (derived by allocating the 10,050,000 tons of estimated stone reserves over the $746,492 cost basis) resulted in total deductions of $61,228 for those two years. As of January 1, 1965, then, plain-

tiffs' estimated stone reserves had been reduced to 9,225,714 tons, while their adjusted basis in those reserves stood at $685,264.

By letter of April 30, 1965, the Township Manager of East Whiteland Township notified plaintiffs that the Pennsylvania Highway Department contemplated relocating Swedesford Road approximately 500 feet north of its then existing center line—that is, onto plaintiffs' quarriable land. That letter also reminded plaintiffs of the restrictions imposed by the 1961 permit barring quarrying with 150 feet of the ultimate right of way of Swedesford Road.

Still later, on August 3, 1967, plaintiffs received a letter from the Pennsylvania Department of Highways which notified them that Department employees would enter the property to conduct engineering studies, surveys, tests, and soundings during the period August 1967 through August 1968. That letter further stated: "It is not at all certain that your property will ever be required for highway right of way * * *. * * * Please note that your property has not been condemned, and you are not required to move from the premises."

The state did not condemn any portion of the property until, at the earliest, May 12, 1970 when the Secretary of the Pennsylvania Highway Department filed a declaration of taking covering approximately 70 percent of the quarry with the Court of Common Pleas of Chester County, Pennsylvania. The area actually condemned closely corresponded with the area mentioned in the Township Manager's letter of April 30, 1965.

In August 1970 plaintiffs received condemnation proceeds of $250,00 from the state. Plaintiffs instituted legal proceedings to obtain full value for the condemned property. The dispute was settled in 1973, when the state paid plaintiffs additional condemnation proceeds of $595,650. .

Reg. § 1.611–1(a)(1) (1984). The code and regulations permit a taxpayer to compute that allowance using either cost depletion (calculated on the taxpayer's basis per unit in the mineral deposit) or percentage depletion (calculated as a statutory percentage of the taxpayer's gross income from mining), whichever results in the greater deduction.

Even though the condemnation of plaintiffs' property did not take place until sometime in 1970, they anticipated the occurrence of that event long before the fact. To explain: immediately following receipt of the Township Manager's letter of April 30, 1965, plaintiffs, in keeping with their understanding of the situation, pursued no further mining activity on that part of the quarry identified with the contemplated highway relocation. At the same time, in anticipation of this taking of their property, plaintiffs reduced the estimate of the quarry's recoverable stone reserves to 2,685,817 tons.

Although this restatement of recoverable reserves reflected plaintiffs' view that the minable area of their property had been immediately diminished by the prospective taking, nevertheless, they did not assign any part of their basis in the property to the "relinquished" acreage. That is to say, in determining their allowance for cost depletion during the years 1965 through 1969, plaintiffs, on the one hand, assumed a reduction in the original estimate of recoverable stone reserves while, on the other hand, they continued to use the basis originally allocated to the entire reserve as the measure of the cost remaining to be recovered. That had the effect of increasing their depletion rate from the pre-1965 figure of $.07428 per ton to $.2551 per ton.

Upon audit of the taxpayers' returns in 1970, the IRS disallowed the cost depletion deduction claimed for 1969 on the ground that "the basis for the portion of the quarry being operated" had been fully recovered through the depletion allowances of prior years. The disallowance, after adjustment, came to $65,481. Plaintiffs seek to have refunded the amount of their 1969 income taxes attributable to that disallowance.

### DISCUSSION

The IRS disallowed plaintiffs' cost depletion deduction based upon its view that the downward revision of the quarry's estimated stone reserves amounted, in essence, to a redefinition of the boundaries of the property available for mining, hence dictating a corresponding adjustment in the basis of that property. With this reasoning as the predicate, the IRS then went on to its conclusion: that the "basis [as adjusted] for the portion of the quarry being operated" had been fully recovered.

Defendant relies upon this same reasoning in meeting plaintiffs' demand for refund. But, in addition, defendant raises the point that it would have been equally appropriate for plaintiffs to have dealt with the prospective condemnation by making no adjustments at all—either in the estimate of recoverable reserves or in the original basis of the property. Under this second approach, the anticipated diminution of the size of the property available for mining (and the associated decrease in stone reserves) would be ignored until the time of actual condemnation. Although the Government urges this as an alternative answer to the problem raised here, the court is of the view that it is, in fact, the only correct answer.

It is a fundamental principle of tax law that transactions may not be given tax effect until all events have occurred which will make the tax consequences fixed and certain. *Thor Power Tool Co. v. Commissioner*, 439 U.S. 522, 543, 99 S.Ct. 773, 786, 58 L.Ed.2d 785 (1979). Plaintiffs' interpretation of the depletion statute violates this rule. Their downward revision of the estimate of recoverable reserves, and the increased per-ton depletion rate resulting from this revision, reflected a loss of mineral assets long before all the events had occurred which would make the loss of those assets fixed and certain. Conjecture of this sort is inimical to the interests of an orderly revenue system.

Plaintiffs argue that they were obliged to recognize a reduction in estimated reserves by the language of 26 U.S.C. § 611(a), which states, in pertinent part, as follows:

In any case in which it is ascertained as a result of operations or of development work that the recoverable units [of min-

eral] are greater or less than the prior estimate thereof, then such prior estimate (but not the basis for depletion) *shall be revised* and the allowance under this section for subsequent taxable years shall be based on such revised estimate. [26 U.S.C. § 611(a) (1982) (emphasis added).]

The applicable regulation amplifies the statutory language by stating:

> If the number of recoverable units of mineral in the deposit has been previously estimated for the prior year or years, and if there has been no known change in the facts upon which the prior estimate was based, the number of recoverable units of mineral in the deposit as of the taxable year will be the number remaining from the prior estimate. * * * [Treas.Reg. § 1.611–2(c)(2) (1984).]

Plaintiffs point to the Township Manager's letter of April 30, 1965 as disclosing the change of facts that dictated their revision of the quarry's estimated stone reserves. That letter informed them, for the first time, what portion of their property would eventually be affected by the state's planned relocation of Swedesford Road.

The court does not agree with plaintiffs' view that the Township Manager's letter represented notice to them of a change in facts which required a reduction of the estimated mineral reserves. It is true that, because the permit under which the quarry operated contained a restriction on mining within 150 feet of the "ultimate right of way" of Swedesford Road, the planned relocation had some prospective effect on the conduct of mining on plaintiffs' property. It is stipulated that, after receiving the letter, plaintiffs never initiated mining on the portion of the property that was later condemned by the state.

Nevertheless, the essential facts underlying the quarry's operation remained unchanged in 1965. The quarry permit had contained the set-back restriction from the time plaintiffs first purchased the property, and there are no facts to suggest that plaintiffs' voluntary response to the notice they received on April 30, 1965 hampered the on-going quarrying operations in any way. Nor is there any suggestion that the estimate of recoverable reserves of stone on the property was incorrect, as a geological matter. On the contrary, plaintiffs relied upon the accuracy of the original estimate in calculating their revised estimate in 1965. The only basis in fact for plaintiffs' reduction of the estimated reserves was the possibility that the highway relocation might prohibit the recovery of stone which undeniably existed on the property.

The court views this factual situation as falling outside the intended scope of 26 U.S.C. § 611(a) and Treas.Reg. § 1.611–2(c)(2). The statute and regulation, as the court reads them, are intended to remedy mistakes of geological fact: situations where the actual size of the mineral deposit in place, as originally estimated, is later determined, on the basis of more complete exploratory studies, for example, to be greater or less than earlier information indicated.

The cases plaintiffs have cited do not stand for a different result and, in fact, reinforce the court's interpretation. Both *McCahill v. Helvering,* 75 F.2d 725 (8th Cir.1935) and *Martini v. Commissioner,* 28 T.C.M. (CCH) 1038 (1969), involve situations where the taxpayers discovered in later years—in one case through a newly developed mathematical formula, in the other through an exploratory survey—that their properties contained more mineral than was originally believed.

When the case is understood as falling outside the specific language of 26 U.S.C. § 611(a) and the accompanying regulation, it becomes virtually indistinguishable from the broader array of loss recognition cases. Here plaintiffs have attempted to anticipate—albeit in terms of the depletion allowance rather than as a conventional loss deduction—the disposition of a portion of their mineral assets before that disposition was closed and completed.

In that regard, the court sees this situation as analogous to those cases in which owners-in-fee of mineral bearing properties have attempted to deduct, as losses, the

decrease in value occasioned by a discovery that the mineral assets were less extensive than had been thought. *See, e.g., Henley v. United States*, 184 Ct.Cl. 315, 396 F.2d 956 (1968); *Martin Marietta Corp. v. United States*, 3 Cl.Ct. 453 (1983). Those cases have held that the diminution in value, or even the retreat into worthlessness, of the mineral property, without more, does not represent a closed and completed transaction such as would permit a loss deduction.

In the present case, only the exercise of hindsight permits it to be said that the Township Manager's letter accurately described the portion of the property—and thus the size of the mineral deposit—which was to be condemned. Viewed from the perspective of 1965, that letter cannot be said to represent anything more than a notice—and that not even from the entity with the authority to condemn the property—of what the state proposed to do. Indeed, as late as 1967, the Pennsylvania Department of Highways informed plaintiffs that it was "not at all certain that [their] property [would] ever be required for highway right of way".

Even if it could be said, as of 1965, that it was probable that a certain portion of the quarry, along with its mineral reserves, would be condemned by the state, still this would be an insufficient basis upon which to anticipate the fact—either by revising the estimated reserves or by severing the property. As the Supreme Court has said: "the tax law, with its mandate to preserve the revenue, can give no quarter to uncertainty." *Thor Power Tool Co. v. Commissioner*, 439 U.S. at 543, 99 S.Ct. at 786. In short, it is the court's opinion that the tax treatment of plaintiffs' mining operation at their Valley Forge quarry should remain consistent from the date of the quarry's purchase in 1963 until its condemnation in 1970. No adjustment either to estimated mineral reserves or to cost basis is permissible in 1965.

Plaintiffs make a final argument in support of their view by drawing an analogy to the law of depreciation. According to plaintiffs, because cases have held that, once depreciable property is devoted to use in a trade or business, the allowable depreciation must be deducted even when the property becomes idle, therefore, by analogy, this court should permit depletion of the value of plaintiffs' mineral deposits which were idled by the proposed road relocation. This argument is not sound.

█ It is true, as plaintiffs state, that both depreciation and depletion are deductions designed to permit a taxpayer to recover his capital investment over the useful life of exhaustible assets. However, that similarity does not compel similar tax treatment of idled assets, for the economic consequences of idling depreciable assets are fundamentally different from those which result when depletable assets are idled. It is a fact of life that depreciable assets, such as machinery or buildings, deteriorate over the years, whether or not they are in daily use. The depreciation deduction takes into account this economic reality. By contrast, if a depletable mineral property is idled, it is, by definition, no longer being exhausted because the mineral remains in place and may be recovered at a later time. The allowance for depletion recognizes this fact, for it applies only to the amount of mineral actually extracted from the property. Therefore, no analogy between depreciation and depletion compels the court to permit plaintiffs to recover their cost basis in the mineral deposit on the restricted portion of the property by upholding their claim to an increase in the per-ton depletion rate.

## CONCLUSION

For the reasons stated, plaintiffs are not entitled to the refund they seek. Judgment for defendant, dismissing, pursuant to Rule 54(b), that part of the complaint titled "The Valley Forge Depletion Issue", shall be entered 30 days from the date of this opinion unless, prior to that time, the parties file a stipulation that plaintiffs are entitled to recover some lesser sum in consequence of the court's opinion.